575 P.2d 801

**HONEYWELL INFORMATION SYSTEMS, INC., a Delaware Corporation, Appellant,**

v.

**MARICOPA COUNTY, a political subdivision of the State of Arizona, Department of Property Valuation, an agency of the State of Arizona, Appellees.**

**No. 1 CA–CIV 3290.**

Court of Appeals of Arizona,
Division 1,
Department C.

Nov. 15, 1977.

Rehearing Denied Jan. 6, 1978.

Review Denied Jan. 31, 1978.

. Martori, Meyer, Hendricks & Victor, P.A. by William J. Maledon, H. Bartow Farr, III, Phoenix, for appellant.

Bruce E. Babbitt, Atty. Gen. by Mary Z. Chandler, Donald P. Roelke, Asst. Attys. Gen., Phoenix, for appellee Dept. of Property Valuation.

Beer, Kalyna & Simon by Olgerd W. Kalyna, Phoenix, for appellee Maricopa County.

## OPINION

FROEB, Chief Judge.

In this property tax case, appellant Honeywell Information Systems, Inc. (Honeywell) contends that the Maricopa County Assessor overvalued 39 items of computer equipment for 1973 taxes. Honeywell paid the taxes under protest and appealed the assessment to the State Board of Property Tax Appeals. The Board upheld the valuation fixed by Maricopa County and Honeywell appealed to the Superior Court in accordance with A.R.S. §§ 42–146, 42–151 and 42–152. After presentation of Honeywell's case and prior to appellees' case, the court granted judgment in favor of the appellee taxing authorities and against Honeywell. This appeal followed a denial of a motion for new trial.

The fundamental issue raised by Honeywell concerns the purported taxation of intangible services, such as classroom education, systems support engineering services, and computer programs, collectively known as "software" in the computer industry and discussed more fully in the Appendix. Honeywell contends that software is not taxable in Arizona and that the Assessor's inclusion of software in the overall valuation of the 39 pieces of electronic equipment, known as "hardware," resulted in an excessive assessment. Honeywell also con-

tends that in assessing the software appellees knowingly and intentionally discriminated against it in violation of Ariz.Const. art. 9, § 1 and U.S.Const. amend. XIV, since software is not assessed against other taxpayers similarly situated.

On the other hand, appellees contend that it was not necessary for the trial court and it is not necessary for this court to decide whether software is taxable, because the evidence did not prove that the valuation placed on the 39 pieces of equipment represented anything more than the value of the hardware involved. Appellees argue that the question of taxation of intangibles is, therefore, academic. They further argue that Honeywell never overcame the presumption of correctness of the valuation created by A.R.S. § 42–152(B) because Honeywell failed to prove the value of each of the 39 pieces of equipment but instead proved only a single valuation covering all of them. Finally, they claim that the discrimination issue is not before the court because it is not properly raised.

### TAXABILITY OF SOFTWARE

■ The Arizona unsecured personal property tax statutes (A.R.S. §§ 42–601 through 42–671) and the general administration of tax statutes (A.R.S. §§ 42–101 through 42–163) do not contain a precise definition of the term "personal property." However, under A.R.S. § 42–201, dealing with real property and secured personal property taxes, "personal property" is defined as "property of every kind, both tangible and intangible, not included in the term real estate." Moreover, in accordance with Ariz.Const. art. 9, § 2, the legislature has provided that all property in the state is subject to taxation except for specific exemptions in A.R.S. § 42–271. Our cases have held that exemption is the exception and not the rule and one claiming an exemption must point to a provision of law to sustain the contention. *State v. Yuma Irrigation District,* 55 Ariz. 178, 99 P.2d 704 (1940); *Memorial Hospital v. Sparks,* 9 Ariz. App. 478, 453 P.2d 989 (1969). Nevertheless, while Arizona statutes have long authorized taxation of intangibles, our cases have held that intangibles may not be taxed because the legislature has failed to provide a means of equalization for or collection of a tax against intangibles. *See Brophy v. Powell,* 58 Ariz. 543, 121 P.2d 647 (1942); *Maricopa County v. Trustees of Arizona Lodge No. 2,* 52 Ariz. 329, 80 P.2d 955 (1938); *State Tax Commission v. Shattuck,* 44 Ariz. 379, 38 P.2d 631 (1934). While recently there have been several amendments to the taxing statutes, appellees refer us to none which would overcome the impediments to taxing intangibles described in the above cases. Tax statutes are to be strictly construed against the taxing authorities and any ambiguities are to be resolved in favor of the taxpayer. *State Tax Commission v. Miami Copper Co.,* 74 Ariz. 234, 246 P.2d 871 (1952).

■ There is little doubt that computer software is intangible property and, as such, should be excluded in determining the value of tangible computer equipment. While this question is one of first impression in this state, every jurisdiction which has considered the issue agrees. *See District of Columbia v. Universal Computer Associates, Inc.,* 151 U.S.App.D.C. 30, 465 F.2d 615 (1972); *County of Sacramento v. Assessment Appeals Board,* 32 Cal.App.3d 654, 108 Cal.Rptr. 434 (1973); *Greyhound Computer Corp. v. State Dept. of Assessment & Taxation,* 271 Md. 674, 320 A.2d 52 (1974).

The issue of property taxation of intangible computer software has been the subject of several articles. *See* Martin, *The Revolt Against the Property Tax on Software: an Unnecessary Conflict Growing Out of Unbundling,* 9 Suffolk Univ.L.Rev. 118 (1974); Bryant & Mather, *Property Taxation of Computer Software,* 18 N.Y.L.F. 59 (1972); Heinzman, *Computer Software: Should it be Treated as Tangible Property for Ad Valorem Tax?,* 37 J. Taxation 184 (1972). In each of these articles the author concludes that property taxation of intangible computer software is unjustified. Ironically, the International Association of Assessing Officers (of which the officials in Mari-

copa County responsible for the assessment in this case are members) has opined in its valuation guidelines for electronic data processing equipment that "[i]n those valuation cases wherein the prices have not yet been unbundled, in the interest of uniformity the assessor has the duty of taking these intangible services out of the value." International Association of Assessing Officers (IAAO), *Electronic Data Processing Equipment: Valuation Guidelines* (Special Report, 1972) at 11.

■ A.R.S. § 42–152(B) creates a factual presumption that the valuation made by the appropriate authority is correct and lawful. The presumption is overcome when evidence contradicting the presumption is received. *Department of Property Valuation v. Trico Electric Cooperative, Inc.,* 113 Ariz. 68, 546 P.2d 804 (1976); *State Tax Commission v. Phelps Dodge Corp.,* 62 Ariz. 320, 157 P.2d 693 (1945). The taxpayer has the burden of proof. *Graham County v. Graham County Electric Cooperative, Inc.,* 109 Ariz. 468, 512 P.2d 11 (1973); *State Tax Commission v. Magma Copper Co.,* 41 Ariz. 97, 15 P.2d 961 (1932). Moreover, the taxpayer must show that the valuation was excessive and demonstrate the full cash value of the property. *See Graham County v. Graham County Electric Cooperative, Inc.* Generally, proof of excessiveness will be an integral part of the proof of true cash value. *Navajo County v. Four Corners Pipe Line Co.,* 107 Ariz. 296, 486 P.2d 778 (1971).

■ There is no dispute as to the method of valuation used by appellees. Honeywell confined all of its proof in Superior Court to the same method; namely, catalog list price less accumulated depreciation. Honeywell's contention is that appellees erroneously included in their starting point (i. e., bundled catalog list price) the value of certain nontaxable items such as computer application programming, systems support engineering services, and classroom education. Honeywell proved which elements are a part of its bundled catalog list price for a computer system and also what portion of the list price is directly allocable to intangible services. Thus the trial court's conclusion that

Honeywell failed to show that appellees' valuation of the equipment in question was excessive is unsupported.

■ Appellees' main argument is that Honeywell was required to show excessive valuation with respect to each item of electronic data processing equipment in question by an appraisal of the equipment. We reject this. The taxpayer's initial burden is only to prove by competent evidence that the assessor's valuation is excessive. A.R.S. § 42–152(C); *Navajo County v. Four Corners Pipe Line Co.* Honeywell proved this and met its burden. There is no requirement that the taxpayer or the assessor must have each item of property inspected and appraised. In fact, the Arizona Supreme Court suggests the opposite in *Security Properties v. Arizona Department of Property Valuation,* 112 Ariz. 54, 537 P.2d 924 (1975). The test of fair market value is not necessarily what an appraiser thinks the property is worth but rather what the property would sell for between a willing buyer and a willing seller in an arms-length transaction. The sales price at which the same or similar property is offered for sale is ordinarily viewed as the most significant indicator of fair market value. That is why the appellees themselves relied on sales prices as a method of valuing the property involved here. It is apparent that the argument that proof of sales price is insufficient and that appraisal evidence was necessary is incorrect.

Honeywell proved that the bundled catalog list price used by appellees for valuation purposes is attributable in part to separable intangible software services such as computer application programs, systems support engineering services, and classroom education. Honeywell showed that 24.4% of the bundled catalog list price is attributable to these intangible software services and that the intangible software services were provided to the lessees of the 39 items of equipment. Honeywell's systems support manager in Maricopa County testified that he reviewed all of the time records of his department for the lessees of the equipment and determined that Honeywell had

provided 38,712 man-hours of systems support engineering services and 15,340 student hours of classroom educational services from January 1, 1973 through April 30, 1974. The services were provided without separate charge to the customer. If these figures are projected over a hypothetical five-year life of a computer system and standard industry charges for the same type of support and educational services provided by unbundled vendors and independent software suppliers are applied (see Appendix), the result is that Honeywell will have provided $4,560,819 worth of systems support and educational services to the lessees of the equipment in question over the lives of those systems. Since the total bundled catalog list price of the 39 items of equipment is $18,765,603, the mathematical projection reveals that the portion of the overall catalog list price of the 39 items which is attributable to intangible software services is approximately 24.3%, a figure almost identical with that determined by Honeywell on the basis of its nationwide study (see Appendix).

We conclude that Honeywell has proved that the appellees' valuation of the electronic data processing equipment is excessive and that the same evidence would also support a determination of the true cash value of the equipment.

## SYSTEMATIC DISCRIMINATION

Honeywell contends that the trial court erred in concluding that it failed to show that appellee taxing authorities had knowingly and systematically discriminated against Honeywell in the valuation of the electronic data processing equipment in question.

Initially, appellees claim that the trial court was barred from consideration of the issue because there is no jurisdiction to consider it in a tax appeal under A.R.S. § 42–151. Honeywell injected the issue into the trial court proceedings by an amendment to its notice of appeal which was granted by the trial court over appellees' objection. We find no error in this. Honeywell could have filed a separate action under A.R.S. § 42–204 raising this issue, and it would have been appropriate for the trial court to consolidate the two cases since the proofs are overlapping.

The evidence offered by Honeywell makes it apparent that appellees knowingly and systematically discriminated against Honeywell by assessing personal property taxes against it on a different and more inclusive basis than other similarly situated taxpayers during the same period (see Appendix). In other words, Honeywell was assessed for the software component and other computer companies were not.

It is well established in Arizona that deliberate and systematic discrimination in the assessment and collection of taxes is unlawful. *Hillock v. Bade,* 22 Ariz.App. 46, 523 P.2d 97 (1974), *aff'd,* 111 Ariz. 585, 535 P.2d 1302 (1975); *Southern Pacific Co. v. Cochise County,* 92 Ariz. 395, 377 P.2d 770 (1963); *Sparks v. McCluskey,* 84 Ariz. 283, 327 P.2d 295 (1958); *McCluskey v. Sparks,* 80 Ariz. 15, 291 P.2d 791 (1955).

The facts clearly show discriminatory taxation. Honeywell markets its computer hardware and its separable software services at a single price. On the other hand, large computer manufacturers, such as IBM and Control Data, market their computer hardware at one price and most of their software services at separately stated prices. In valuing the leased computer equipment of companies such as IBM and Control Data, appellees looked only to the catalog list price of those vendors' computer hardware. Appellees made no attempt to tax the unbundled computer vendors on the value of their software services as in the case of Honeywell. Indeed, the price catalog used by the County Assessor, *Auerbach's Computer Characteristics,* does not even contain prices for software services unless they are included as part of a single bundled price for the services and hardware together.

The testimony of Robert E. Noble, division head of the appellee Department of Property Valuation reflects this:

Q. (Mr. Reed) What do you understand—strike that.

Do you have an understanding of the phrases bundled and unbundled computer vendors?

A. (Mr. Noble) I think I do.

Q. And if you could, explain for us, sir, what that understanding is.

A. Bundled is a company that offers hardware plus the software as a unit, and the unbundled is they just offer the hardware.

Q. When you say as a unit, do I understand you to mean for a single price?

A. Yes.

Q. Do you understand a company like Honeywell to be a bundled vendor?

A. That is my understanding.

.     .     .     .     .

Q. And in reporting the list price, according to the guide lines that you promulgated, what price should a bundled vendor use?

A. Retail selling price.

Q. And that is the retail selling price for the bundle?

A. Yes.

Q. And what price, according to your guide lines, should an unbundled vendor report?

A. Retail selling price.

Q. And that is the retail selling price for the pieces of equipment?

A. Whatever the unit is.

Q. But for the equipment?

A. Yes.

Q. It is not the hundred dollars a day that he may charge somebody to go to his classroom that he reports, it is only—

A. No. We would never know about it, it would never be reported.

The following exchange took place when Mr. Noble was questioned about potential inequitable taxation of a bundled vendor's software:

Q. (Mr. Reed) In promulgating these guide lines, and in seeing to it that the bundled and the unbundled vendor were taxed the same way, and that is what I understand the duties of equalization to be, is that correct?

A. (Mr. Noble) Yes.

Q. In seeing to it that the bundled and the unbundled vendor are taxed in the same manner, was any effort made in the guide lines you promulgated to see to it, or to require the unbundled vendor to report not only the list price for his equipment but the list price for the classroom education and also the list price for the system support, and finally the list price of the computer programs, or according to your guide lines is the unbundled vendor only required to report the list price for his equipment?

A. Well, the answer to your first question was no. And the second question, he is only to report his original retail selling price.

Q. So when you say the answer to my first question was no and the second was yes—

A. There was no special effort to correct this problem.

Q. Okay. Was there any other kind of effort, special, less than special, a whole bunch less than special, or any kind of effort at all to correct this problem?

A. I think we knew the problem was there, but we just didn't have time to get to it.

Moreover, the testimony of the head of the personal property section of the Maricopa County Assessor's Office shows that the County Assessor not only knew that bundled vendors, such as Honeywell, were being taxed on a more stringent basis than unbundled vendors, such as IBM and Control Data, but, in addition, that the County Assessor's Office supposedly had a policy of not taxing intangible software services. Finally, the evidence indicates that appellees made no effort to assess personal property tax on the value of software services supplied by the many independent software houses and service bureaus operating in Maricopa County. We think the showing of tax discrimination is clear.

## DISCOUNTS OFF THE CATALOG PRICE

▮▮▮▮ Honeywell challenged the valuation on the additional ground that the

Assessor should have taken Honeywell's established discount policies into consideration before using catalog list prices to determine the full cash value of the equipment for property tax purposes.

Honeywell offered considerable evidence that it publishes discounts for educational and nonprofit technological institutions, for purchasers of certain systems who pay cash within 90 days after purchase and for certain competitive purchasers, such as governmental entities. Honeywell's evidence indicates that the "discounts are available to all commercial customers as well as government customers. They're available to everyone." The testimony at trial dwelled on the 39 individual leases of equipment and whether and to what extent the lessees actually enjoyed a discount of some kind in their contracts with Honeywell. The testimony showed that discounts, other than for cash sales, vary considerably, depending upon the equipment and the customers involved in the transaction. The effect of discount policies and actual discounts given to the lessees involved here, whether they may or may not affect fair market value of the equipment, was not specifically determined by the trial court in its findings of fact and conclusions of law. As this is a factual determination which must be made by the trial court on remand, we will not attempt to evaluate Honeywell's evidence in this respect except to state generally our perception of the relevance of that evidence.

The issue is the correct fair market value of the equipment in question. Honeywell has already presented a prima facie showing that the valuation by the appellees is excessive. Having done so, it must prove the fair market value of the equipment. We have stated it may do this by reference to catalog price, particularly since appellees have used catalog price in their valuation. We have further stated that the catalog price of Honeywell's equipment should be reduced to reflect the value of software included in that price. With respect to discounts, we direct the trial court to consider the proof relating to discounts to determine if the fair market value (full cash value) of the equipment is more correctly arrived at by reducing the catalog price by discounts. Fair market value is best indicated by sales price, not list price. *Burns v. Herberger*, 17 Ariz.App. 462, 498 P.2d 536 (1972); *State Tax Comm'n v. United Verde Extension Mining Co.*, 39 Ariz. 331, 6 P.2d 889 (1931). Sales price means *cash* sales price. Fair market value is full *cash* value. Thus, if the equipment involved would change hands between the seller and the buyer for cash at a price less than the unbundled catalog price, the valuation should so reflect. On the other hand, if a seller discounts equipment to a buyer at a price below the fair market value in order to develop its market or gain an entry to the customer's business, it may be that such a discount from the unbundled catalog price would not be reflective of fair market value. We are prepared only to say now that the trial court must weigh and evaluate the proof concerning discounts in order to arrive at its determination of fair market value.

## ADMISSION OF DOCUMENTS AND TESTIMONY

In view of our opinion, it appears that certain documentary and testimonial evidence was incorrectly excluded from evidence by the trial court. The claimed errors are not likely to recur on remand to the trial court and, therefore, we will not deal with them at this time.

It is ordered that the Findings of Fact, Conclusions of Law and Judgment of the trial court be set aside and the case be remanded to the Superior Court for further proceedings consistent with this opinion. On remand, it is ordered that the trial court open appellant's case for the taking of such additional evidence as the trial court deems appropriate, together with such evidence as appellees may offer, and that the trial court thereafter enter its findings of fact, conclusions of law and judgment as may be warranted by the evidence.

JACOBSON and OGG, JJ., concur.

## APPENDIX

A statement of the facts presented by Honeywell in its brief furnishes the background necessary for a general understanding of the technical aspects of the case.

Appellant Honeywell manufactures, sells and leases electronic data processing equipment and also provides its customers a wide range of related services and activities. The electronic data processing industry as a whole is made up of a variety of companies and businesses, large and small, which offer numerous types of products and/or services to users of electronic data processing equipment. These products and services include the electronic data processing equipment itself (often referred to as the computer "hardware") and professional and technological services, such as classroom education, systems support engineering services, and computer programs (often collectively referred to as the computer "software"). The data processing equipment or so-called "hardware" comprising a data processing unit consists of a central processing unit or main frame and peripherals such as input and output terminals and memory storage devices. Classroom education consists of courses designed to teach the operation and programming of data processing equipment. Systems support engineering services are provided by personnel who assist the computer user in the programming and usage of the data processing equipment. Computer programs are the instructions which make the data processing equipment perform tasks and include "operational programs" which are the basic functions of the computer and "application programs" which are the particularized instructions adapted for an individual user.

In order to have an effective electronic data processing system, a user must have a central processing unit, input and output consoles, memory devices, as well as educational training, systems support engineering services and both operational and application programs. It is not necessary, however, that all of these products and services be provided to the customer by the same company or supplier and it is often the case that the customer obtains them from different suppliers.

Among the many companies and businesses which make up the electronic data processing industry, some, like Honeywell, offer the full spectrum of products and services; others, who are sometimes referred to within the industry as "software houses" or "service bureaus," provide mostly services such as computer programming, systems support engineering services and classroom education.

At the present time, the electronic data processing industry is dominated by several large companies which manufacture and sell computer hardware as well as provide a full range of programming support and educational services. The principal companies in the industry are IBM Corporation, Honeywell, Sperry-Rand, Burroughs and Control Data Corporation.

The method by which companies in the electronic data processing industry market and sell their products and services differs dramatically. Some companies which provide a full range of products and services choose to market and sell those products and services on a "bundled" basis, while other such companies choose to market and sell their products and services on an "unbundled" basis. A "bundled vendor" is one that charges a single, overall price for the computer hardware and the related software such as classroom education, systems support engineering services and computer application programs. An "unbundled vendor" is one that charges a separate price for the variety of computer hardware and software services which that vendor provides.

There exist varying degrees of bundling and unbundling among vendors in the electronic data processing industry. Typically, the most unbundled of the large computer companies is Control Data which charges a separately stated price for each item of equipment and for the operating programs, for the application programs and for every element of support and educational service. The marketing practices of IBM are somewhat similar, generally charging a single

price for the computer hardware and operating programs and charging a separately stated price for each application program and each element of systems support and educational service. The most bundled of the large computer companies is Honeywell. That is to say that Honeywell markets and sells its products and services in such a manner that the customer pays one overall price for the computer hardware and internal operating programs together with the application programs and any systems support engineering services or classroom education which the customer may need during the life of the system.

For the most part, the prices for the various items of computer hardware and computer systems which are offered for sale by the large computer companies are contained in elaborate price lists which are published by the companies themselves. In addition, there are commercial publications, such as *Auerbach's Computer Characteristics,* which contain list prices at which computer companies have announced they will sell their products. The prices contained in the catalogs published by Honeywell (as well as the prices contained in the commercial publications such as *Auerbach's* insofar as the relate to Honeywell) are bundled prices for a complete data processing system, including computer hardware and related application programs, systems support engineering services and classroom education. There are also separate commercial price catalogs which contain data relating to the software services and separate charges of companies like IBM and Control Data who, unlike Honeywell, do not provide software services as part of a single overall price.

The large, unbundled computer companies, such as IBM and Control Data, in addition to charging a separately stated price for most application programs performed for a customer, charge the customer a separately stated daily or hourly rate for systems support engineering services and classroom education. In the tax year in question (1973), the standard charge to its customers by IBM for systems support engineering services was $33 per hour. So

also, the separately stated charge for classroom education within the electronic data processing industry was a standard rate of between $100 and $150 per student per day. Similarly, the typical charge by independent computer service bureaus in Maricopa County in 1973 for systems support engineering services was between $30 and $40 an hour and the typical charge by unbundled vendors and private data processing schools in Maricopa County in 1973 for classroom educational services was between $75 and $150 per student per day. In each instance, the type of systems support and educational services provided by the unbundled vendors and service bureaus at a separately stated price are the same types of systems support and educational services provided by Honeywell as part of its single overall bundled price.

In the case of a typical, complete data processing system, a user who obtains all of his products and services on an unbundled basis will generally spend about 65–70% of the total cost and charges for the system over its life for the computer hardware (including internal operational programs) and the remaining 30–35% of the total cost and charges during the system's life for application programs, systems support engineering services and educational activities. In any given case, however, the percentage of a complete electronic data processing system's cost and charges during the life of the system which is attributable to application programs, systems support engineering services and educational activities will vary considerably depending on the nature of the system and the sophistication of the user.

In 1971, and again in the winter of 1972, auditors for Honeywell conducted studies concerning the portion of Honeywell's bundled catalog list price for its data processing systems which is attributable to intangible items such as application programs, systems support engineering services and classroom educational services. In conducting these studies the auditors utilized weekly reports of hours work prepared in the ordinary course of business by Honeywell's field personnel (referred to by Honeywell as the

Weekly Activity Reporting System or simply WAR System). From the WAR records, the auditors determined, by reference to 10 separate categories of software services [1] which percentage of the time spent by all of the various types of Honeywell's field personnel was attributable to non-manufacturing, non-sales and marketing, and non-maintenance efforts—or, in other words, which portion of the field personnel time was allocable to software services such as application programming, systems support engineering services and classroom educational services. This information relating to the percentage of time spent by Honeywell field personnel in providing intangible software services was then applied to Honeywell's overall expense figures for its field personnel during the same period of time. Finally, once the portion of field personnel expense attributable to intangible software services was determined, this figure was applied against the dollar volume of Honeywell's net shipments of computer systems during that period as reflected in the Honeywell financial records, which dollar volume of net shipments was arrived at on the basis of bundled catalog list price for all products and services provided by Honeywell during that time period. The results of these studies, taken together, disclosed that 24.4% of the bundled catalog list price for Honeywell's data processing systems is attributable to intangible software services such as application programs, systems support engineering services and classroom educational services.[2] Or, stated conversely, only 75.6% of Honeywell's bundled catalog list price is attributable to computer hardware and operational programs.

In addition to the fact that catalog list price for a Honeywell computer system reflects the bundled price for computer hardware and software services, Honeywell's marketing practices include an established, well-defined and consistent discount policy whereby the catalog list price for a Honeywell computer system is reduced by as much as 20% for certain types of customers such as schools and colleges and purchasers who acquire certain complete lines of Honeywell computer systems. These discount policies are formally published in the various catalogs containing Honeywell list prices. Moreover, the discounts are available to all qualified Honeywell customers, without exception.

In the instant case, Honeywell is the owner of certain electronic data processing

1. The ten categories of software services, as defined by Honeywell, are:

1. Custom Programs—The writing (coding) and testing of customized programs is a service, requiring the development or ascertainment of information, and the evaluation of data, in addition to other development skills.

2. Designing and implementing computer systems. (e. g., determining equipment and personnel required and how they will be utilized.)

3. Designing storage and data retrieval systems. (e. g., determining what data communication system and input/output devices are required.)

4. Converting manual systems to automated data processing systems; converting present automated data processing systems to new systems. (e. g., changing a 2nd generation system to a 3rd generation system.)

5. Consulting services. (e. g., study of all or part of a data processing system.)

6. Feasibility studies. (e. g., studies to determine what benefits would be derived if procedures were automated.)

7. Evaluation of bids. (e. g., studies to determine which manufacturer's proposal for computer equipment would be most beneficial.)

8. Providing technical help, analysts and programmers.

9. Computer time required to test programs prior to installation of system.

10. Educational services.

2. With reference to the ten categories of software services set forth in Footnote 1, the individual percentages of bundled catalog list price making up the 24.4% are as follows:

| | |
|---|---|
| (1) custom programs | .7% |
| (2) designing and implementing computer systems | 2.3% |
| (3) designing storage and data retrieval systems | 2.3% |
| (4) converting manual systems | 9.8% |
| (5) consulting services | 1.3% |
| (6) feasibility studies | .9% |
| (7) evaluation of bids | .8% |
| (8) technical help | .7% |
| (9) computer test time | 2.7% |
| (10) educational services | 2.9% |
| TOTAL | 24.4% |

equipment which it leased to customers at 39 locations within Maricopa County in 1973. In accordance with the Assessor's policy of taxpayer self-assessment, Honeywell timely filed its 1973 unsecured personal property tax report, computing the undepreciated value of the equipment by taking the bundled catalog list price and reducing that figure by 24.4% to reflect the value of the intangible software services included in the bundled list price and by an additional 10% to reflect the average of the discounts given by Honeywell under its established discount policy.[3] A standard 5-year depreciation factor for such equipment (mandated by guidelines of the Appellee Department of Property Valuation) was then applied to arrive at the full cash value of the equipment which was reported by Honeywell in its tax return. Honeywell's reported valuation for 1973 was $2,165,587.

The Maricopa County Assessor determined, however, that the electronic data processing equipment in question should be valued at Honeywell's bundled catalog list price less only the appropriate amount of depreciation determined in accordance with Appellees' standard 5-year depreciation formula. Accordingly, the Assessor disallowed Honeywell's deduction from its bundled catalog list price of 24.4% for application programming, systems support engineering services and classroom education as well as Honeywell's deduction from catalog list price to reflect the average of discounts regularly given to its customers. The Assessor then entered his full cash value determination of the equipment in question on the 1973 unsecured personal property tax rolls in the total amount of $3,301,200, with each computer system at the 39 customer locations in question being reflected by a separate tax roll number from 63027 to 63066.

Honeywell paid its 1973 unsecured personal property taxes on the electronic data processing equipment in question timely and under protest. Honeywell appealed the Appellee taxing authority's determination of the full cash value of the equipment to the State Board of Property Tax Appeals and the Board upheld the value placed upon the equipment by Appellee. Upon appeal, the Superior Court entered judgment in favor of Appellees.

---

**3.** The 10% discount figure was subsequently amended to 8.1% by Honeywell at the trial in the court below.