749 P.2d 930

**CAMELBACK DEL ESTE HOMEOWNERS ASSOCIATION, an unincorporated association et al., Plaintiffs/Appellees/Cross-Appellants,**

v.

**Ronald H. WARNER and Carolyn Warner, husband and wife, et al., Defendants/Appellants/Cross-Appellees.**

2 CA–CV 87–0151.

Court of Appeals of Arizona, Division 2, Department B.

Sept. 29, 1987.

Review Denied March 1, 1988.

Robbins & Green, P.A. by Philip A. Robbins and Charlotte A. Ortlund, Phoenix, for plaintiffs/appellees/cross-appellants.

Winston & Strawn by Arthur P. Greenfield, Danial D. Maynard, Donald J. Cleary, and Frank S. Bangs, Jr., Phoenix, for defendants/appellants/cross-appellees.

## OPINION

ROLL, Judge.

Defendants / appellants / cross-appellees Ronald H. Warner and others (Warner) appeal from an order of the superior court granting declaratory and injunctive relief to plaintiffs/appellees/cross-appellants Camelback Del Este Homeowners Association and others (Camelback Homeowners). Camelback Homeowners filed a cross-appeal, seeking additional declaratory relief and additional attorneys' fees. The primary issue on appeal is whether the restrictive covenants of a Phoenix subdivision are enforceable against commercial encroachment.

### FACTS

Camelback Del Este is a Phoenix subdivision consisting of 83 single-family residences which borders on Camelback Road. The area surrounding the subdivision has undergone tremendous changes over the past three decades. Camelback Road has been widened in this area from two lanes to seven lanes. Whereas thirty years ago East Camelback Road had an average weekday traffic flow of 15,200 vehicles, it now has an average weekday traffic flow of over 50,500 vehicles, the highest daily traffic flow of any street in Phoenix. Camelback Homeowners represents the owners of the 83 residences situated in the subdivision.

The subdivision is subject to deed restrictions which include the following:

4. No structure shall be erected, altered, placed or permitted to remain on any of said lots other than one detached single-family dwelling not to exceed two stories in height, and a private garage not to exceed one story in height for not more than two cars, and a guest house or servant quarters for the sole use of actual non-paying guests or actual servants of the occupants of the main residential building.

\* \* \* \* \* \*

The foregoing restrictions and covenants run with the land and shall be binding on all persons owning any of the said lots in Camelback Del Este until February 25, 1967 at which time said covenants shall be automatically extended for successive periods of ten years each, unless by a vote of a majority of the then owners of the said lots in said Camelback Del Este it is agreed to change the said covenants in whole or in part.

Ronald H. Warner was aware of the deed restrictions of the subdivision. In September of 1983, Warner purchased one of the subdivision lots in the vicinity where a garden-office complex was planned. He then obtained options to buy eight additional lots at the proposed site of the complex. The options were obtained by offering the various owners between $150,000 and $350,000 per residence. Warner's real estate expert testified that the most any home in the subdivision sold for in 1984 was $119,000.

Warner filed an application for a zoning change with the City of Phoenix in connection with the nine lots. Thereafter, on August 12, 1984, Warner met with some of the owners in the subdivision. Warner asserts that no resident stated that they intended to enforce the restrictions and that had any homeowner informed Warner of such intent, the Warners would have amended the rezoning application.

An attorney who resided in an adjoining subdivision discussed the restrictions with Ronald Warner. During August of 1984, the attorney told Warner, "Ron, even if you get the rabbit out of the hat in this thing, and somehow get city council to approve this zoning for commercial office, you still got deed restrictions, and, you know, how are you ever going to get around the deed restrictions?" On October 9, 1984, Warner conducted a poll of all homeowners in the subdivision. The results indicated that Warner lacked substantial support for lifting the restrictions and proceeding with the project. On October 17, 1984, the Phoenix City Council held a hearing regarding Warner's zoning request. One homeowner declared in Ronald Warner's presence at the hearing, "[W]e will not relinquish these deed restrictions without a fight."

On December 5, 1984, Camelback Homeowners filed a complaint seeking declaratory and injunctive relief to enforce the restrictive covenants. On April 24, 1985, with leave of the court, the Camelback Homeowners filed an amended complaint adding a second count which also sought a declaratory judgment that the restrictions were not subject to change until February 25, 1987, and, further, that any changes had to apply to all lots uniformly unless 100% of the homeowners agreed to non-uniform amendment. The amended complaint was apparently precipitated by Warner's circulation of a petition to change the restrictions as to certain lots in the subdivision.

Warner asserts that he will have lost between $350,000 and $400,000 expended on this project if he is not permitted to build the complex. However, only $8,000 was expended before the October 17, 1984, Phoenix City Council hearing regarding the rezoning.

## TRIAL COURT'S RULINGS

The trial court refused to permit Warner to file a counterclaim against certain homeowners who attended a meeting to discuss the project and who, Warner alleges, failed to voice their intent to enforce the restrictions.

The matter was tried to the court in May and June of 1985. On January 30, 1986, the trial court granted Camelback Homeowners declaratory and injunctive relief. The restrictions were held applicable to all lots and enforceable against Warner, and Warner was restrained from removing existing single-family dwellings to construct commercial and/or office buildings. The trial court also awarded Camelback Homeowners attorneys' fees of $44,750; they had requested $63,688.50. The trial court did not rule on Camelback Homeowners' request for declaratory judgment as to whether the restrictions could be removed as to some of the subdivision lots without approval of 100% of the homeowners.

## ISSUES ON APPEAL

On appeal, Warner raises the following issues: (1) whether the nine lots should have been relieved of the restrictive covenants; (2) whether the trial court should have considered the hardship on the respective parties in determining whether to relieve the nine lots of the covenants; (3) whether Camelback Homeowners is estopped from enforcing the covenants by virtue of its failure to timely manifest opposition to the project; and (4) whether the trial court erred in dismissing Warner's counterclaim against some of the homeowners. Camelback Homeowners cross-appeal, seeking a declaratory judgment that any changes in the restrictive covenants must apply to all residences in the subdivision unless 100% of the homeowners agree to piecemeal exclusion. Camelback Homeowners also seek an increase in attorneys fees awarded.

## SEVERABILITY OF RESTRICTIVE COVENANTS

The issue of severing certain lots from operation of restrictive covenants governing a subdivision is not a matter of first impression in this state. In *Continental Oil Company v. Fennemore*, 38 Ariz. 277, 299 P. 132 (1931), our supreme court held that where the residential character of the entire neighborhood remains substantially intact, the court will not engage in a lot-by-lot analysis to consider the release of a portion of the neighborhood from restrictive covenants. This same principle has been reiterated in *Decker v. Hendricks*, 97 Ariz. 36, 396 P.2d 609 (1964) ("Decker I"), and *Decker v. Hendricks*, 7 Ariz.App. 162, 436 P.2d 940 (1968) ("Decker II"). In *Continental Oil*, the supreme court stated:

> It is also a matter of common knowledge and accepted human experience that, if the restrictive bars were let down for appellant in this case, the business encroachment on the remainder of the addition would be a matter of gradual yet steady development against which the home owners would be helpless, and the benefits and protection of the restrictive covenants would eventually be lost to all the co-owners therein.

38 Ariz. at 285, 299 P. at 135. In *Continental Oil* the supreme court upheld a lower court ruling that a gas station could not be erected on a lot of a subdivision containing restrictive covenants even though the proposed gas station would have been situated at the intersection of East Roosevelt and 7th Street in Phoenix. Continental Oil Company sought relief from the covenants governing the subdivision because of the greatly diminished residential value of the particular lot where the proposed gas station was to be situated. The supreme court stated:

> We adhere to the doctrine that the lot of appellant cannot be considered separate and apart from its relation to the entire restricted addition. *Though there may be a fringe of property all around the borders of a restricted addition which would be more valuable for business than for residential purposes, this fact alone is not sufficient to warrant the breach of restrictions by these owners.*

38 Ariz. at 286, 299 P. at 135 (emphasis added).

In *Decker II*, this court stated that the test for determining whether restrictive covenants should be enforced is "whether or not the conditions have changed so much that it is impossible to secure in a substantial degree the benefits intended to be se-

cured by the covenants." 7 Ariz.App. at 163, 436 P.2d at 941. In *Decker II,* the proponents of the business enterprise seeking relief from the restrictive covenants emphasized the "radical and fundamental changes" on the main thoroughfare bordering the subdivision. This court stated:

> [S]ince the changed conditions have occurred outside the restricted district, we must look to the effect that the changes have upon the entire district to determine if the purposes have been frustrated.

7 Ariz.App. at 164, 436 P.2d at 942.

The dilemma presented in this matter is common to rapidly growing urban areas. In *Lebo v. Johnson,* 349 S.W.2d 744, 751 (Tex.Civ.App.1961), the court stated:

> In every growing city it is inevitable that sooner or later commercial and business areas must come face to face with residential areas, and it is then that the restrictions are most valuable to the interior lot owners. It is when the outer tier of lots become more valuable for commercial and business purposes that the restrictions come into play and prevent the residential area from being taken over by commercial establishments....
>
> \*   \*   \*   \*   \*   \*
>
> The front tier of lots must bear the brunt of the onslaughts of business and commerce, otherwise there would be started a system of gradual encroachment that might swallow up the entire area. The other tiers of lots might fall like ten pins, once the encroachment of commerce and business was begun.

See also *West Alameda Heights Homeowners Association v. Board of County Commission,* 169 Colo. 491, 458 P.2d 253 (1969); *Finley v. Batsel,* 67 N.M. 125, 353 P.2d 350 (1960); *Cliberti v. Angilletta,* 61 Misc.2d 13, 304 N.Y.S.2d 673 (1969).

In the matter before us, it is undisputed that East Camelback Road has undergone tremendous expansion and increased use over the past thirty years. However, the court found that the changes apparent along Camelback Road were not present within the subdivision. At the request of both parties, the trial court viewed the subdivision at different times of the day and night and concluded that while the three lots actually situated on Camelback Road were less desirable as residences, the remaining 80 lots remained desirable for single-family homes. The court found that the streets were quiet with little traffic and concluded that the "evidence is clear that the purpose of the restrictions have not been frustrated and the subdivision now, almost thirty years later, still remains as a quiet, single-family neighborhood." The court found that the restrictions had preserved the character of the subdivision.

Based on these findings and supporting evidence, the trial court followed precedent in concluding that the nine lots intended to be the site of the office complex should not be relieved of the covenants. The trial court observed that the three lots along Camelback Road bear the brunt of the growth of the entire Camelback corridor, but if the first tier of defensive lots were eroded, the next line of homes would become the first line of defense. The trial court concluded that the front tier of lots on Camelback Road must bear the brunt of encroachments in order to prevent the gradual erosion of the residential character of the Camelback Del Este neighborhood.

Nor is the position of Warner improved by the fact that he owns one of the nine lots in the subdivision, for "[t]o permit the border lot owners to later renege on their bargain to the detriment of the interior lot owners is to give them an economic advantage that they did not pay for." *2 American Law of Property,* § 9.39 at 447 (1952). The court must consider the overall relation of the various lots and not merely decide whether it may be in the best interest of particular lot owners in a subdivision to be absolved from the operation of restrictive covenants.

Warner argues that the rule of law in Arizona, as articulated in *Continental Oil* and its progeny, is inconsistent with public policy and modern land use concepts. We disagree. In *Continental Oil,* the supreme court wrote:

> The policy of the courts of this state should be to protect the home owners who have purchased lots relying upon,

and have maintained and abided by, restrictions, from the invasion of those who attempt to break down these guaranties of home enjoyment under the claim of business necessities.

38 Ariz. at 286, 299 P. at 135. The policy considerations enunciated in *Continental Oil* remain as vibrant and compelling now as when they were written in 1931. The trial court was correct in concluding that the restrictive covenants were enforceable as to all lots in the subdivision. The decision of the trial court is not clearly erroneous and will not be disturbed on appeal. *Whittemore v. Amator*, 148 Ariz. 173, 175, 713 P.2d 1231, 1233 (1986).

## RELATIVE HARDSHIPS

■ Warner contends the trial court erred by not considering the relative hardships to the parties. Although Warner asserts that he will suffer economic loss of between $350,000 and $400,000 should the complex not be built, the evidence clearly established that he was aware of the restrictions in the subdivision before most of the expenditures were incurred, as well as the intention of at least some homeowners to enforce the covenants. It would indeed be inequitable to permit a party who is fully cognizant of building restrictions and the opposition of at least some homeowners to changes in those restrictions to expend large sums of money on the gamble that the restrictions would not be enforced against him and then claim that enforcement of the restrictions works a hardship on him. *Decker v. Hendricks*, 97 Ariz. 36, 41–42, 396 P.2d 609, 612 (1964); *Condos v. Home Development Co.*, 77 Ariz. 129, 136, 267 P.2d 1069, 1073 (1954). In the instant case, the trial court stated:

> In addition, the Court finds that the defendants were aware of and had notice of the deed restrictions. Their actions were voluntary and they proceeded with their plans for the office complex with full knowledge that the lots were restricted. Any expenditures incurred by them were done in a knowing manner and not as a result of any inducement on the part of the plaintiffs.

The trial court did not err in refusing to balance the hardships that Warner brought upon himself.

## ESTOPPEL

■ Warner contends that the trial court erred in finding that the plaintiffs' conduct was consistent with enforcement of the covenants. Estoppel has three recognized elements: 1) acts inconsistent with the claim afterwards relied on; 2) action by the adverse party on the faith of such conduct; 3) injury to the adverse party resulting from *the repudiation of such conduct. *Holmes v. Graves*, 83 Ariz. 174, 177, 318 P.2d 354, 356 (1957). Our courts have stated, "[a] correlative essential element of estoppel is that one seeking its protection must have lacked knowledge, and the means of acquiring knowledge, of the facts relied upon. A party's silence will not operate as an estoppel against it where the means of acquiring knowledge were equally available to both parties." *Honeywell Inc. v. Arnold Construction Co., Inc.*, 134 Ariz. 153, 158, 654 P.2d 301, 306 (App. 1982). The record contains ample evidence that Warner was aware of the existence of the covenants and that at least one homeowner, in Warner's presence, publicly voiced an intention to enforce them. A poll conducted by Warner indicated a lack of substantial support for the office complex. Nevertheless, Warner expended substantial sums in furtherance of the office plans. On this record, the trial court could properly conclude that Camelback Homeowners was not estopped from enforcing the covenants.

## COUNTERCLAIM

■ Warner contends that the trial court erred in refusing to permit the filing of a counterclaim against certain homeowners who attended a meeting with Warner to discuss the proposed project. These homeowners, Warner alleges, requested that Warner prepare a proposal extending the complex two lots deep into the neighborhood in return for the homeowners' support and their enlistment of support of other homeowners. Warner contends that the failure of these homeowners to ultimately support the two-lot-deep plan entitle him to maintain an action for breach of

contract and promissory estoppel. Warner's motion for leave to file the counterclaim was filed May 3, 1985, less than two weeks before trial commenced. It was within the trial court's discretion under Rule 13(f), Rules of Civil Procedure, 16 A.R.S., to deny the motion to file a counterclaim, and the trial court did not abuse its discretion in so ruling. *See Harbel Oil Company v. Steele*, 1 Ariz.App. 315, 318, 402 P.2d 436, 439 (1965).

## CROSS–APPEAL

■ Camelback Homeowners cross-appeal, asserting that the trial court should have entered a declaratory judgment in its favor on the issue of whether the declaration of restrictions could be amended so as not to apply uniformly to all lots in the subdivision. The trial court did not address this prayer for relief. The pertinent portion of the restrictive covenant governing the subdivision provides as follows:

> The foregoing restrictions and covenants run with the land and shall be binding on all persons owning any of said lots in Camelback Del Este until February 25, 1967 at which time said covenants shall be automatically extended for successive periods of ten years each, unless by a vote of the majority of the then owners of the said lots in said Camelback Del Este it is agreed to change the said covenants in whole or in part.

Both parties agree that the law in Arizona is that, unless otherwise provided for in the restrictions themselves, any amendment to restrictive covenants must apply to every lot. *La Esperanza Townhome Association, Inc. v. Title Security Agency of Arizona*, 142 Ariz. 235, 239, 689 P.2d 178, 182 (App.1984); *Riley v. Boyle*, 6 Ariz.App. 523, 526, 434 P.2d 525, 528 (1967). Warner argues that the above-quoted provision is ambiguous. Camelback Homeowners contend that the provision is not ambiguous, and, when there is no ambiguity in the language, such provisions must be given their plain, ordinary meaning. *Duffy v. Sunburst Farms East Mutual Water & Agricultural Company, Inc.*, 124 Ariz. 413, 416–17, 604 P.2d 1124, 1127–28 (1979). *Montoya v. Barreras*, 81 N.M. 749, 473 P.2d 363 (1970), cited in *La Esperanza*

*Townhome Association, supra,* involved an amendment provision with language virtually identical in pertinent part to that involved in the instant case. In *Montoya,* the New Mexico Supreme Court held that although the restrictions themselves may be changed in whole or in part, the change or changes made must affect all of the described properties. We agree, and the trial court erred in failing to grant declaratory relief to that effect. We therefore modify the judgment to award the declaratory relief requested.

## ATTORNEYS' FEES

Finally, Camelback Homeowners appeal from the order of the trial court awarding $44,750.00 in attorneys' fees, contending that they should have been awarded the full amount claimed, $63,688.50. Attorneys' fees were awarded according to A.R.S. § 12–341.01(B), and the trial court did not abuse its discretion in awarding substantial attorneys' fees albeit not in the amount claimed by Camelback Homeowners.

Appellees are awarded attorneys' fees on appeal in an amount to be determined upon the filing of the statement required by Rule 21, Rules of Civil Appellate Procedure, 17A A.R.S.

LIVERMORE, P.J., and HOWARD, J., concur.