764 P.2d 1124

**Thornton G. DEWEY,**
**Plaintiff/Appellant,**

**v.**

**Vivian ARNOLD, an unmarried woman; and John Cardi, an unmarried man; Stewart Title & Trust of Tucson, an Arizona corporation, as Trustee; John and Jane Does 1 Through 5, and Corporations X, Y and Z, Defendants/Appellees.**

**No. 2 CA–CV 87–0313.**

Court of Appeals of Arizona,
Division 2, Department B.

May 31, 1988.

As Corrected June 21, 1988.

Reconsideration Denied July 12, 1988.

Review Denied Nov. 29, 1988.*

* Gordon, C.J., of the Supreme Court, did not participate in the determination of this matter. Feldman, V.C.J., of the Supreme Court, recused himself and did not participate in the determination of this matter.

Ethan Steele, Tucson, for plaintiff/appellant.

Feulner & Cornelio, P.C. by George J. Feulner, Tucson, for defendants/appellees.

ROLL, Judge.

Plaintiff/appellant Thornton G. Dewey (Dewey) appeals from orders denying his motion to amend a complaint and entering summary judgment in favor of defendants/appellees Vivian Arnold (Arnold), John Cardi (Cardi), and others. For the reasons set forth below, we vacate the respective orders and remand for further proceedings.

### FACTS

On August 9, 1982, Vivian Arnold and John Cardi offered for sale approximately 1,151 acres situated in Pinal County at a price of $350 per acre. The listing agreement made several references to the availability of water. The listing stated in part:

> Since the removal of the foreman, the wells, electric poles, pumps etc. have been vandalized, thus, the reason for offering as raw land only at $350 per acre.

The section which discussed improvements stated in part:

> The value of the wells, we feel is unestimateable but have been told they cannot be replaced today for under $200,000. All have been vandalized. They are reg-

istered and applications for grandfathered groundwater rights submitted together with 400 acres of irrigation. Of course, if this is granted, there will be a much greater value to the land etc—with the permit—the price it is being offered at today ignores the possibility and looks at the raw land only.

Under the section of the agreement entitled "price," the listing stated that the property was being offered at $350 per acre. Another section also stated in part:

> We feel the true value, with water rights (central arizona irrigation district) as well as the wells with their possibilities, the depreciation factor, the engineering and surveying completed and paid for, the potential for selling as subdivided, etc. is worth at least several hundred moreper [sic] acre, raw; HOWEVER, it is our desire to liquidate; therefore we are offering at this unusually low price.

The listing also declared:

> We repeat, raw land alone, and that is what we are offering, should surely be worth $350 per acre anywhere in Arizona, regardless of condition, lack of amenities etc.

The listing further stated that "[a]ll information furnished has been secured from sources deemed reliable, but no responsibility is assumed, therefore, is submitted subject to errors, omissions, and changes, prior sale and withdrawal without notice."

Approximately two months after the property was listed, the Pinal Active Management Area Director for the Arizona Department of Water Resources (Department of Water Resources) sent a letter to Arnold, which provided in part:

> The Pinal Active Management Area office has reviewed your application for Grandfathered Groundwater Rights for your farm in Sections 3, 4, and 10, Township 10S, Range 8E. Our investigation verifies that no acres had a history of irrigation during the required time frame of January 1, 1975 through January 1, 1980, as set forth in the state's groundwater law. Although you claim that 350 acres of pasture were irrigated every year during this time frame, we could

find no records to support your claim. No ASCS records are available for your farm and our photographs do not show evidence of irrigation.

> \* \* \* \* \* \*

> We will not be able to recommend that a certificate of Grandfathered Right be issued for your land unless you can provide evidence that a pasture was planted and irrigated on your property between 1975 and 1980.

Following Arnold's receipt of this letter, the listing was not changed.

On February 8, 1983, Dewey entered into a deposit receipt and agreement with Arnold and Cardi. The terms of the agreement provided that Dewey purchase the property for a total price of $402,850, with $100,000 down and the balance due in annual installments over an eight-year period. The agreement acknowledged that on February 8, 1983, Dewey paid $10,000 as earnest money for the described property. The agreement continued that, in addition to the described property, also conveyed (with preprinted material in boldface) were:

> fixtures, water heaters, tanks and softeners, gas tanks, heating plants, cooling or air conditioning units, mailbox, wall-to-wall carpeting, and the following listed personal property: **RAW LAND** (wells, equipment, fencing, ditches etc. **AS IS WHERE IS** [) ].

It appears that, following the closing of this transaction, Dewey gave Arnold an exclusive listing to sell the property.

On November 10, 1983, Dewey discovered the letter regarding grandfathered groundwater rights. He and Arnold then met with Herb Dishlip, Director of the Pinal Active Management Area, who confirmed there was no basis for the defendants' claim of grandfathered water rights on the property. Dewey took no action at this point and permitted Arnold to continue her attempts to sell the property through the listing.

In January, Dewey retained counsel to pursue the matter. However, it appears that no action was taken by counsel until April 12, 1984, when a letter was sent to

Arnold setting forth Dewey's claim of fraud and proposing the outline of a settlement in lieu of litigation. In the meantime, however, Dewey failed to make the annual installment payment due March 1, 1984. Dewey's complaint was not filed until June 1, 1984. Additionally, Dewey leased the premises for grazing purposes for $1.00 per acre.

## PROCEDURAL HISTORY

On June 1, 1984, Dewey filed a complaint seeking rescission of the contract based upon alleged misrepresentations by Arnold. The alleged misrepresentations included (1) statements that wells on the property had been used within the time period required to qualify for grandfathered groundwater rights, (2) likely resale of parcels of the property sufficient to meet installment payments due on the property, and (3) the absence of liens against the property.

On June 26, 1984, Arnold and Cardi noticed a trustee's sale of the property for October 12, 1984. Dewey filed an application for preliminary injunction, asserting that injunctive relief was required so that the property would be preserved "as security for his recovery upon rescission...." Arnold and Cardi opposed the issuance of an injunction, arguing that injunctive relief was inappropriate because Dewey sought rescission of the contract and an injunction was not necessary to preserve the remedy plaintiff was seeking, that is, return of Dewey's down payment. Thereafter, Dewey withdrew his application for injunctive relief.

A trustee's sale was held on October 12, 1984, and Arnold and Cardi repurchased the property for $275,000. On October 24, 1984, Arnold and Cardi sued for a deficiency judgment in the amount of $80,000.[1]

On May 23, 1986, Dewey moved to amend his complaint to seek damages in lieu of rescission. The trial court denied this motion. Thereafter, on two occasions, Dewey again moved to amend the complaint. These motions were also denied.

The defendants filed three motions for summary judgment in the action. The first, arguing that the alleged misrepresentations were merely opinions as to future events which could not form the basis for a claim of fraud, was initially granted by the trial court. On reconsideration, however, the motion was denied as to the allegations pertaining to grandfathered water rights. The second motion, arguing that Dewey did not rely on the alleged misrepresentations as to grandfathered water rights and was therefore not damaged, was also denied. The third motion, claiming that Dewey had delayed unreasonably in seeking to rescind the contract after discovering the alleged fraud, was granted and is the subject of this appeal.

## ISSUES ON APPEAL

On appeal, Dewey argues that the trial court should have permitted him to amend his complaint and that summary judgment should not have been granted in favor of the defendants.

## AMENDMENT OF COMPLAINT

Rule 15(a), Ariz. R. Civ. P., 16 A.R.S., provides in part that "[l]eave to amend shall be freely given when justice requires." The standard of review for a trial court's granting or denial of a motion to amend a complaint is abuse of discretion. *Parks v. Macro–Dynamics, Inc.,* 121 Ariz. 517, 520, 591 P.2d 1005, 1008 (App. 1979). Discretionary amendments to pleadings should be liberally granted. *Id.* It is an abuse of discretion to deny without reason a motion for leave to amend. *Id.; see also Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222, 226 (1962).

In considering Dewey's motion to amend the complaint, the trial court noted that Dewey's initial complaint sought only rescission of the contract, and that based on the complaint "the defendant then took the property back at the trustee sale." The trial court continued:

---

1. The action for deficiency judgment is currently being held in abeyance until resolution of this action.

[T]he plaintiff in this case, unambiguously by his complaint, declared that he wanted to rescind the contract and give the property back. Then the property was allowed to go at trustee sale. The defendant took it back and the court feels at this juncture that the plaintiff is bound by the situation they have created, that there has been a change of position on the part of the defendants in that they acted at the trustee sale.

Arnold and Cardi assert that the trial court properly refused to permit amendment of the complaint, because (1) Dewey's actions constituted a rescission at law, which is a binding election of remedies, and (2) the doctrine of estoppel precludes the amendment of the complaint. We disagree.

A rescission at law is one which occurs outside of and without the assistance of the courts. *See generally* D. Dobbs, *Law of Remedies* §§ 4.3, 4.8 (1973). "If the plaintiff has adequate substantive grounds for avoiding the transaction, his notice to the defendant that he has done so, accompanied by restoration to the defendant of benefits received by the plaintiff in the transaction, will itself amount to a rescission." *Id.*, § 4.8 at 293. While the plaintiff may require the assistance of the courts in recovering from the defendant what he gave under the contract, the contract is nevertheless rescinded prior to the commencement of that action by virtue of the plaintiff's tender and the defendant's acceptance of the benefits received under the contract from the defendant. *Id.; see also Parks v. Macro–Dynamics, Inc.*, 121 Ariz. 517, 521, 591 P.2d 1005, 1009 (App. 1979).

In the present case, no rescission occurred prior to the commencement of Dewey's action. Dewey did not tender the property back to Arnold and Cardi prior to filing the complaint, nor have Arnold and Cardi ever accepted the tender. Contrary to the defendants' claim that their purchase of the property manifested their consent to the rescission, by noticing and conducting the trustee's sale, Arnold and Cardi have effectively rejected the tender and affirmed the contract by insisting on their rights thereunder. Accordingly, the refusal to permit an amendment of the complaint cannot be predicated on the existence of a binding election resulting from a rescission at law.

The basis for the trial court's order appears to have been the defendants' claim of estoppel. The three elements of estoppel are (1) acts inconsistent with the claim afterwards relied on, (2) action by the adverse party on the faith of such conduct, and (3) injury to the adverse party resulting from the repudiation of such conduct. *Camelback Del Este Homeowners Ass'n v. Warner*, 156 Ariz. 21, 26, 749 P.2d 930, 935 (App. 1987).

The defendants claim that they relied on Dewey's action in seeking to rescind the contract when the defendants noticed the trustee's sale and purchased the property for a bid price of $275,000. They allege that they were prejudiced thereby in two ways. First, the defendants claim that by virtue of their purchase of the property at the trustee's sale, Dewey has been relieved of his obligations to pay under the note, as well as taxes and insurance on the property. While this is true, we cannot say that this resulted from the filing of Dewey's action for rescission. The notice of trustee's sale and the defendants' subsequent purchase of the property was the result of Dewey's failure to make the annual payment due in March of 1984, not the filing of the complaint. Further, a defrauded purchaser is not precluded from maintaining an action for damages by his election to cease payments under the contract and permit a foreclosure. *Garrett v. Perry*, 53 Cal. 2d 178, 346 P.2d 758 (1959). Thus, the defendants position would have been the same regardless of the relief sought by Dewey.

The second allegation of prejudice is that, if Dewey were permitted to sue for damages, the defendants' bid would be admissible as evidence of the fair market value of the property, thereby increasing the potential damages recoverable by Dewey. In an action based on fraudulent mis-

representations, the measure of damages is determined by the benefit of the bargain rule. That is, the plaintiff is entitled to recover the difference between the value of the property as represented and its actual value. *Steele v. Vanderslice*, 90 Ariz. 277, 286, 367 P.2d 636, 642 (1961). The defendants contend that, in this case, evidence of the bid price could be introduced to establish that the fair market value of the property was $275,000, rather than the $402,000 purchase price, thus increasing the potential damages recoverable by Dewey.

Our courts have had occasion to define fair market value in a number of cases. In *Honeywell Information Systems, Inc. v. Maricopa County*, 118 Ariz. 171, 174, 575 P.2d 801, 804 (App. 1978), Division One held that the test for determining the fair market value of property was "what the property would sell for between a willing buyer and a willing seller in an arms-length transaction." This court has held that "[m]arket value is determined by hypothesizing a sale; it is that price a desirous but unobligated purchaser would pay a desirous but unobligated seller after consideration of all uses to which the property is adapted and for which it is capable of being used." *TCC Enterprises v. Estate of Erny*, 149 Ariz. 257, 258, 717 P.2d 936, 937 (App. 1986). Regardless of the language used, one common theme is that market value can be determined only from transactions which are free of any element of compulsion.

Our courts have not previously been presented with the issue of whether the price paid for property at a trustee's sale may be admitted as evidence of its fair market value. In the context of eminent domain proceedings, the general rule is that forced sales, including sales under a deed of trust, are not admissible as evidence of fair market value. *See generally* 5 *Nichols' The Law of Eminent Domain* § 21.32 (1985), and cases cited therein. Our supreme court has held that evidence of sales to a purchaser having the power of condemnation are admissible in condemnation proceedings only if a proper foundation has been laid, that is, that "the sale was voluntary, that the owner was willing to sell but not compelled to do so, that the buyer was willing to buy but under no necessity of buying the property." *State v. McDonald*, 88 Ariz. 1, 8, 352 P.2d 343, 348 (1960); *see also Rayburn v. State*, 93 Ariz. 54, 378 P.2d 496 (1963). Similarly, in *State ex rel. Herman v. Transamerica Title Ins. Co.*, 17 Ariz. App. 411, 498 P.2d 485 (1972), Division One upheld the trial court's exclusion of a probate sale of property as evidence of fair market value on the basis that it was a forced sale.

The statutes pertaining to trustee's sales clearly contemplate that the purchase price will not reflect the fair market value of the property because of the nature of the sale. Following a trustee's sale, A.R.S. § 33–814(A) provides that an action may be maintained to recover a deficiency judgment.

> [F]or an amount equal to the sum of the total amount owing the beneficiary as of the date of the sale, as determined by the court and the amount owing on all prior liens and encumbrances with interest, less the fair market value of the trust property on the date of the sale as determined by the court or the sale price at the trustee's sale, *whichever is higher*. (Emphasis supplied.)

We conclude that, absent the requisite foundation showing that the sale was made willingly, without coercion or compulsion, the purchase price at a trustee's sale would not be admissible as evidence of the fair market value of the property. Accordingly, no prejudice resulted to the defendants as a result of their election to notice the trustee's sale and bid on the property.

Defendants further contend that their complaint in the deficiency action would be admissible in an action for damages, presumably as an admission of a party-opponent as to the fair market value. *See* Rule 801(d)(2), Ariz. R. Evid., 17A A.R.S. While this is true, we fail to see any legally cognizable prejudice to defendants. First, it is uncertain from the complaint whether the defendants are alleging that the bid price was the fair market value of the property, or merely that the amount still

owed them exceeded both the bid price and the fair market value. If Dewey is able to prove the allegations of his fraud claim and the issue of damages is tried, he would be free to inquire of the defendants as to their estimate of the value of the property, and the defendants would have the opportunity to explain the allegations of their complaint. If in fact the property was worth only $275,000 on the date Dewey purchased it, we see no reason why he should not be allowed to recover additionally the difference between this amount and the purchase price. On the other hand, if the defendants' complaint misrepresents the fair market value of the property, we see no reason why this court should protect the defendants from the consequences of such a misrepresentation.

In sum, we conclude that the trial court's finding of prejudice is unsupported and that it was error to deny the motion for leave to amend on this basis.

### SUMMARY JUDGMENT

The trial court granted defendants' motion for summary judgment. In reviewing the granting of summary judgment, this court must view the evidence in the light most favorable to the party opposing the motion and draw all inferences fairly arising from the evidence in favor of that opposing party. *Auto–Owners Ins. Co. v. Moore*, 156 Ariz. 184, 185, 750 P.2d 1387, 1388 (Ct.App.1988).

> Summary judgment is appropriate where the record shows that there is no genuine dispute as to any material fact, that only one inference can be drawn from those facts, and that based upon the facts, the moving party is entitled to judgment as a matter of law.

*Id.*

Arnold and Cardi argue that because Dewey waited six months and twenty days after learning of the letter from the Department of Water Resources to file his complaint, his delay in seeking rescission was unreasonable as a matter of law. They further contend that summary judgment was appropriate because Dewey acted in a manner contrary to rescission by attempting to procure a profit from his ownership of the subject property.

A person seeking rescission of a contract must act promptly under the existing circumstances in stating an intent to rescind. *Mahurin v. Schmeck*, 95 Ariz. 333, 340, 390 P.2d 576, 580 (1964); *Smith v. Hurley*, 121 Ariz. 164, 169, 589 P.2d 38, 43 (App. 1978). "[O]ne who has knowledge of fraud as grounds for rescission, but continues to treat the property as his own is deemed to have waived the fraud, at least for purposes of rescission." *Smith, supra*, 121 Ariz. at 169, 589 P.2d at 43. The opportunity to obtain rescission based upon fraud or misrepresentation "is lost if the injured party after having acquired knowledge, actual or constructive, of the fraud, manifests to the other party an intention to affirm or exercises domination of things, restoration of which is a condition of his power of avoidance." *Mackey v. Philzona Petroleum Co.*, 93 Ariz. 87, 91, 378 P.2d 906, 908 (1963), citing Restatement of Law, Law of Contracts, § 484.

What constitutes a reasonable time in which to communicate an intention to rescind is a question of fact "unless the facts are such that only one inference could be derived therefrom in which case it would become a question of law." *Mahurin, supra*, 95 Ariz. at 340, 390 P.2d at 580.

Given the present state of the record, we do not believe that the trial court could properly find that the six months' delay in filing the complaint was unreasonable as a matter of law. The parties are in dispute both as to the reasons for the delay and as to Dewey's purpose in permitting Arnold to continue to attempt to sell the property after learning of the facts constituting the alleged fraud. These issues must be resolved by the trier of fact and, accordingly, the trial court erred in granting summary judgment.

### CONCLUSION

The order of the trial court denying the motion for leave to amend the complaint is vacated. The summary judgment is re-

versed, and the matter is remanded to the trial court for further proceedings.

LIVERMORE, P.J., and FERNANDEZ, J., concur.