701 P.2d 851

**TRANSAMERICA INSURANCE COM-
PANY, a California corporation,
Plaintiff-Appellee,**

v.

**James G. TROUT and Jane Doe Trout,
his wife, Garnishee,
Defendants-Appellants.**

**No. 1 CA–CIV. 7483.**

Court of Appeals of Arizona,
Division 1, Department A.

Jan. 31, 1985.

Jennings, Strouss & Salmon by James T. Skardon and Gammage & Burnham by Richard A. Burnham, Phoenix, for plaintiff-appellee.

Alston, Edwards & Novak, P.C. by Gerald W. Alston and David Brnilovich, Phoenix, for garnishee, defendants-appellants.

## OPINION

HAIRE, Presiding Judge.

This appeal is taken from a judgment against James G. Trout in a garnishment action brought by Transamerica Insurance Company (Transamerica). The trial court ruled that Trout, as recipient of the fraudulent conveyance of property belonging to Transamerica's debtor, was liable to Transamerica for the $55,000 garnished together with interest thereon in conformance with Transamerica's prior judgment against its debtor.

Mr. and Mrs. Bert St. John (St. John) owned approximately 51 acres of farmland which included a dairy and a livestock barn. They operated a livestock auction in the barn and in connection with that business obtained a bond from Transamerica. Transamerica was ultimately obligated to pay $55,000 under the bond to various third parties and then sued St. John and obtained a judgment against him for the money paid pursuant to the bond.

Shortly before Transamerica's judgment against St. John became final, he quitclaimed the farm to Trout. The deed was recorded on September 17, 1974. Trout paid nothing for the farm and never assumed any of the outstanding obligations against it, but took title subject to encumbrances in the amount of $132,905.

Upon attempting to execute on its judgment against St. John in late December of 1974, Transamerica discovered that the farm had been conveyed by St. John to Trout. Transamerica was initially assured by counsel for St. John that Trout had accepted the conveyance of the farm as a favor to St. John and that the mortgages exceeded the value of the property. It was not until Transamerica conducted its debt-

or's examination of St. John on March 18, 1975 that it found that he thought the property was worth more than the amount of the encumbrances on the property. Transamerica obtained an appraisal of the farm in July of 1975 that confirmed St. John's belief.

Trout sold the farm to a bona fide purchaser in 1977, realizing a profit of approximately $75,000. Transamerica served a writ of garnishment on Trout on March 9, 1978, alleging that the conveyance to Trout had been fraudulent under A.R.S. § 44-1004, and attempting to recover $55,000 from Trout.

A trial to the court was held in October 1978, and resulted in a directed verdict for Trout. Transamerica appealed and this court reversed and remanded for a new trial. A second trial was held in March 1983, resulting in the entry of judgment for Transamerica on the writ of garnishment. The trial court ruled that the conveyance to Trout was fraudulent as to Transamerica, that the action was not barred by the statute of limitations, that St. John's intervening discharge in bankruptcy had no effect on Transamerica's claim against Trout and that Transamerica was entitled to judgment against Trout for $55,000 plus interest as provided in Transamerica's original judgment against St. John.

Trout challenges each of these rulings on appeal and also contends that the trial court erred in admitting certain evidence.

Trout argues first that Transamerica's action was barred by the statute of limitations. He contends that the three year period provided by A.R.S. § 12-543 began to run on September 17, 1974, the date the quitclaim deed from St. John to Trout was recorded. Transamerica responds that Trout waived this argument by not raising it until March 1983, shortly before the second trial. Alternatively Transamerica asserts that the statutory period did not begin to run until it discovered facts which could have led it to conclude that there had been a fraudulent conveyance. It argues that this did not occur until it obtained

independent evidence of the value of the property.

■ Generally, it is held that the statute of limitations defense is waived only if it is not asserted prior to judgment. *Romo v. Reyes*, 26 Ariz.App. 374, 376, 548 P.2d 1186, 1188 (1976). An answer may be amended at any time before trial with the permission of the trial judge. *Id.* Transamerica contends that Trout waived the defense because he did not move to amend his answer until March 1, 1983, long after the first judgment and appeal. That judgment was reversed on appeal, however, and the matter remanded for a new trial. We hold that it was within the trial court's discretion to grant Trout's motion to amend his answer prior to the second trial, and therefore that he did not waive the statute of limitations defense.

■ A.R.S. § 12–543, which both parties acknowledge applies to claims based on fraudulent conveyances, provides that a cause of action in fraud accrues when the aggrieved party discovers facts constituting the fraud. The discovery dates from the time that he, by exercise of reasonable diligence, might have discovered the fraud. *Condos v. Felder*, 92 Ariz. 366, 377 P.2d 305 (1962).

■ Trout argues that this standard was met when the quit-claim deed to him from St. John was recorded. It is true that the recordation of a deed constitutes constructive notice of its contents. A.R.S. § 33–416. The statutory period may begin to run on the date of recording if the recorded deed sets forth facts from which the aggrieved party should have realized it had a cause of action. Thus, where a deed explicitly sets forth facts detailing the entire consideration given for the property, creditors are deemed to have discovered any inadequacy of consideration when the deed was recorded. *Strong v. Clark*, 56 Wash.2d 230, 352 P.2d 183 (1960). Similarly, when the deed, considered in the light of other facts known to the creditor, should have put him on notice of fraud, the statute begins to run when the deed is recorded.

*See, e.g., Babcock v. Tam*, 156 F.2d 116 (9th Cir.1946) (applying Arizona law) (while personal injury action pending, defendant transferred his separate property to himself and wife as community property); *Gibson v. Ransdell*, 188 S.W.2d 35 (Mo.1945) (transfer by husband to himself and wife as tenants by the entirety, leaving him without any assets to satisfy his separate obligations); *Causemaker v. DeRoo*, 153 Kan. 648, 113 P.2d 85 (1941) (debtor deeded the very property upon which creditor relied in extending credit to his son.)

■ The deed from St. John to Trout did not purport to set out in detail the consideration agreed upon, reciting only that Trout paid "$10, and other valuable considerations." The language used in this recital accords with a common practice of stating a nominal, legal consideration and is not, in itself, suggestive of fraud. The transfer was to a third party who had no apparent relationship to St. John. Upon inquiry, St. John's attorney represented the property as worth less than the liens against it. Under these circumstances we hold that the recordation of the deed did not constitute notice of such facts as would, as a matter of law, alert Transamerica to the fraudulent nature of the conveyance. Rather, the trier of fact could consider such recordation and the attendant facts, together with all other evidence presented, in arriving at a factual determination of when Transamerica, by the exercise of reasonable diligence, should have discovered the fraudulent nature of the conveyance.

■ The trial court as the trier of fact found that Transamerica, having exercised reasonable diligence, first discovered information indicating that the conveyance might have been fraudulent when it received its appraisal report on July 26, 1975. It thus concluded that Transamerica's action, filed on March 9, 1978, was not barred by the statute of limitations. Even if Transamerica is deemed to have had the requisite notice of the possibility of fraud when it first questioned St. John about the value of the farm property on March 18, 1975, it filed its action within the three

years permitted by the statute. We affirm the trial court's determination on this issue.

The trial court held that St. John's petition in bankruptcy and subsequent discharge did not affect Trout's liability to Transamerica. Trout, relying on a recent appellate opinion which held that the Uniform Fraudulent Conveyance Act does not create a new claim, *Clark v. Rossow*, 134 Ariz. 490, 657 P.2d 903 (App.1982), argues that the discharge in bankruptcy of St. John's underlying debt to Transamerica destroyed Transamerica's status as a creditor and thus, necessarily, its claim under the Uniform Fraudulent Conveyance Act against Trout.

Rather than proceeding directly against Trout in a separate action pursuant to the Uniform Fraudulent Conveyance Act, Transamerica filed suit against St. John and, after obtaining judgment, had a writ of garnishment served on Trout. Garnishment is an appropriate remedy for recovering the proceeds of a fraudulent conveyance. *Sackin v. Kersting*, 105 Ariz. 464, 466 P.2d 758 (1970). Service of a writ of garnishment creates an inchoate lien. *Kuffel v. United States*, 103 Ariz. 321, 441 P.2d 771 (1968).

Although the inchoate lien is not perfected until the creditor obtains judgment against the garnishee-defendant, the majority view is that if the lien attaches prior to the period within which the bankruptcy trustee can avoid it as a preference, it need not be perfected in order to survive a discharge in bankruptcy of the underlying indebtedness. *See generally* Liens by Garnishment, 4 Collier on Bankruptcy, para. 67.10 (14th Ed.1978). "[I]t is of no consequence [in bankruptcy] that the lien may be regarded as inchoate for certain purposes." *Id.* at p. 131. This view is consistent with Arizona law as interpreted by the federal courts. In *Matter of Southwest Restaurant Systems, Inc.*, 607 F.2d 1243 (9th Cir.1979), the court, applying Arizona law, noted "the viable status of an inchoate garnishment lien in bankruptcy when established more than four months before the filing of bankruptcy." *Id.* at

1248, *citing* 4 Collier para. 67.10, pp. 131–32 (14th Ed.1978).

We cannot accept the *Clark* court's broad statement that the Uniform Fraudulent Conveyance Act does not create a "new" claim on behalf of a creditor, if by that statement the court intended to hold that whenever the underlying indebtedness is discharged in bankruptcy, the rights of a creditor in garnishment proceedings are always defeated. As we have just indicated, whenever a writ of garnishment is served against a fraudulent transferee, an inchoate lien is created. That inchoate lien is not affected by the discharge in bankruptcy of the underlying indebtedness if the inchoate lien was established before the commencement of the preference period prior to the filing of the bankruptcy petition. Here, Transamerica's inchoate lien attached when Transamerica's post-judgment writ of garnishment was served, more than 14 months prior to the filing of St. John's petition in bankruptcy. After the attachment of the lien, Transamerica possessed two distinct rights—the right to pursue St. John on his personal liability, and a separate right to pursue its lien in the garnishment proceedings. Under these facts, the bankruptcy discharge merely discharged St. John's personal liability on the indebtedness and Transamerica could no longer pursue him on that basis. The discharge, however, did not destroy the lien rights which Transamerica had obtained through its garnishment proceeding pursuant to the Uniform Fraudulent Conveyance Act. Those lien rights could be pursued notwithstanding the discharge of St. John's personal liability. *See* 1A Collier, para. 17.29 (14th Ed.1978).

Because of the dearth of factual detail in *Clark*, we are unable to determine whether the result we reach in this case is consistent with the result reached by the *Clark* court. Our holding is not inconsistent if a more detailed factual recitation would disclose that in *Clark*, the judgment was declared void because the judgment debtor had received a discharge of the underlying indebtedness in the Minnesota bankruptcy

proceedings before judgment was obtained in Arizona against the debtor. Likewise, there would be no inconsistency if the creditor served the writ of garnishment too late (i.e., within the preference period) and therefore did not obtain a viable garnishment lien. On the other hand, if the facts were such that the creditor in *Clark* had obtained valid inchoate lien rights pursuant to its garnishment against the fraudulent transferee which were not subject to invalidation as a preference, then in our opinion *Clark* was erroneously decided and we decline to follow it in arriving at our disposition of this appeal.

Accordingly, we reject Trout's contention that the trial court erred in holding that St. John's discharge in bankruptcy did not defeat Transamerica's right to pursue Trout under the Uniform Fraudulent Conveyance Act.

Trout argues next that Transamerica failed to meet its burden of proving St. John insolvent by clear and convincing evidence. Under A.R.S. § 44–1002, a person is insolvent for purposes of the Uniform Fraudulent Conveyance Act when "the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured." A.R.S. § 44–1002(A).

■ The elements of a fraudulent conveyance must be proved by clear and satisfactory evidence. *Sackin v. Kersting,* 105 Ariz. 464, 466 P.2d 758 (1970). A finding of insolvency therefore depends on an actual analysis of assets and liabilities—a "fact-and-figure balancing"—rather than mere conclusionary statements. *See, e.g., Hay v. Duskin,* 9 Ariz.App. 599, 603, 455 P.2d 281, 285 (1969).

■ Transamerica easily met this burden. St. John testified that when he deeded the farm to Trout he was two payments in arrears on the mortgage, that he remained liable for the $133,000 in liens on the property, that he owed Transamerica $55,000 and that he owed approximately $10,000 to a third party. He testified fur-

ther that the dairy farm was his only asset. Once he had conveyed it to Trout for no consideration he had no assets, but liabilities of at least $190,000. St. John was clearly rendered insolvent by the conveyance of the dairy farm to Trout.

Trout next contends that the trial court committed reversible error by admitting into evidence the reports of two appraisers who were unavailable for cross-examination. Both were appraisals prepared for St. John prior to the transaction with Trout. He obtained them in order to borrow money to operate his business. These reports consisted of an appraisal by a Mr. Holmes, valuing the property at approximately $165,000, and an appraisal by a Mr. Brown, valuing the property at $240,000.

The trial court admitted the Brown and Holmes reports, over Trout's objection, under the business records exception, Rule 803(6), Arizona Rules of Evidence. This was clearly error.

Rule 803(6) provides that the admission of business records or reports is not barred by the hearsay rule if the records are made *by* a person with first hand knowledge acquired in the course of a regularly conducted business activity, kept entirely in the course of *that* business activity, pursuant to a regular practice of *that* business activity, and introduced through a custodian.

■ The fact that St. John kept the reports among his own business records does not make the documents "business records" within the contemplation of the rule. *See, e.g., Markiewicz v. Salt River Valley Water Users' Ass'n.,* 118 Ariz. 329, 576 P.2d 517 (App.1978). They must have been prepared and retained as a part of the normal course of business of the party preparing them. These reports were prepared by independent appraisers with no relation whatever to St. John's business. Furthermore, the records must be introduced through the testimony of a custodian who can be cross-examined concerning the methods of preparation, the qualifications of the preparer, and other relevant matters. *State v. McGann,* 132 Ariz. 296, 645 P.2d 811 (1982); *N.L.R.B. v. First Termite*

*Control Co., Inc.,* 646 F.2d 424 (9th Cir. 1981); *Forward Communications Corp. v. United States,* 608 F.2d 485, 221 Ct.Cl. 582 (1979). St. John was not a qualified custodian. Not knowing how the reports were made, he could not be subjected to meaningful cross-examination. There was therefore no rational basis on which the trial court could evaluate the accuracy and trustworthiness of the reports.

We agree with Trout that admission of the appraisals was error, but we do not agree that this finding of error requires reversal. Besides St. John's own affidavit of value stating that the property was worth $100,000, there were six appraisals admitted in evidence. Those which were properly admitted valued the property at $102,620; $158,200; $159,000; and $226,000. The trial court found the fair market value of the property to be "in excess of $190,000." Trout argues that, other than the improperly admitted Brown appraisal report, there was no other competent evidence establishing a value of over $200,000. Accordingly, he urges that admission of the Brown appraisal was reversible error.

■■■ We find that there was competent evidence to support the trial court's finding on the value issue. The appraisal of $226,000 was prepared by Thomas A. Ball. Ball testified and was cross-examined on his report. A careful review of his testimony, along with that of the other appraisers, shows no sound basis for Trout's attempts to distinguish the competency or credibility of Ball's appraisal from that of the other appraisers.

Trout does not contest Transamerica's contention that in a trial to the court the erroneous admission of improper evidence is not grounds for reversal if there was sufficient competent evidence at trial to sustain the judgment rendered. This principle is applicable even though it is assumed that if the matter had been tried to a jury, the admission of the evidence would have been not only erroneous, but also prejudicial. *Duncan v. Mack,* 59 Ariz. 36, 122 P.2d 215 (1942). *See also, County of Maricopa v. Sperry Rand Corporation,*

112 Ariz. 579, 544 P.2d 1094 (1976); *Bonine v. Bonine,* 90 Ariz. 319, 367 P.2d 664 (1961); *American Eagle Fire Ins. Co. v. Van Denburgh,* 76 Ariz. 1, 257 P.2d 856 (1953); *Home Owners Loan Corp. v. Bank of Arizona,* 54 Ariz. 146, 94 P.2d 437 (1939); *State v. Gunther & Shirley Company,* 5 Ariz.App. 77, 423 P.2d 352 (1967). In conclusion on this issue, we find that there was competent evidence that the dairy farm was worth in excess of $190,000. Therefore we uphold the trial court's determination of value.

Finally, Trout argues that the trial court erred in awarding Transamerica pre-judgment interest. The only argument made by Trout concerning the interest issue is that pre-judgment interest may not be awarded on a claim sounding in fraud, because a fraud claim is for an unliquidated amount. The authority Trout relies on, *Ulan v. Richtars,* 8 Ariz.App. 351, 446 P.2d 255 (1968), is merely one wherein a particular claim for damages for fraud was unliquidated. No pre-judgment interest was awarded. It does not purport to stand for the broad proposition that damages for fraud can never be liquidated.

■■■ Pre-judgment interest is due on liquidated claims. *L.M. White Con. Co. v. St. Joseph Structural Steel Co.,* 15 Ariz. App. 260, 488 P.2d 196 (1971); *Betz v. Goff,* 5 Ariz.App. 404, 427 P.2d 538 (1967). A claim is liquidated if the evidence furnishes data which if believed makes it possible to compute the amount with exactness. *Homes & Son Construction Co., Inc. v. Bolo Corp.,* 22 Ariz.App. 303, 526 P.2d 1258 (1974). Transamerica's claim is for an exact sum—the amount of its judgment against St. John, $55,000, plus interest at 6% from August 1, 1974 through December 14, 1979, and at 10% thereafter. The trial court's award of interest was proper.

For the foregoing reasons, we affirm the judgment entered by the trial court.

BROOKS and GRANT, JJ., concur.