847 P.2d 117

174 Ariz. 72

**The VILLAS AT HIDDEN LAKES CONDOMINIUMS ASSOCIATION, an Arizona corporation, Plaintiff, Counter-defendant, Appellee,**

**v.**

**GEUPEL CONSTRUCTION COMPANY, INC., and R.G.W. Investment Co., Inc., Defendants, Counter-claimants-Appellants.**

**No. 1 CA–CV 90–263.**

Court of Appeals of Arizona, Division 1, Department D.

Nov. 10, 1992.

Reconsideration Denied Jan. 13, 1993.

Review Dismissed March 16, 1993.

Barry Allen Reiss, P.C. by Barry A. Reiss, Phoenix, for plaintiff, appellee.

Jennings, Kepner & Haug by Chad L. Schexnayder, Phoenix, for defendants, appellants.

## OPINION

TOCI, Judge.

In this appeal, defendants Geupel Construction Company and R.G.W. Investment Co., Inc. ("Developer") challenge the trial court's grant of summary judgment in favor of plaintiff, The Villas at Hidden Lakes Condominium Association ("Association"). The Association, a group of condominium owners organized under a declaration of horizontal property regime ("Declaration"), claimed the Developer owed the Association for delinquent monthly assessments on units formerly owned by Developer. The Association had enacted a late payment charge on past due assessments and had applied the late payment charge retroactively to the Developer's alleged delinquent assessments. Developer disagreed, asserting that it owed no assessments because it had exercised the right to temporarily withdraw twenty-three units from the project. When Developer did not pay, the Association filed suit.

We reverse the granting of summary judgment and remand for proceedings consistent with this opinion. We hold that: (1) because the Developer lawfully withdrew twenty-three units from the original fifty-three unit development, the twenty-three lots in Phase Two were not subject to the monthly assessments and late charges; (2) although the Association possessed the necessary contractual and statutory authority to impose late fees, it exercised its power unreasonably by making the late fees retroactive; and (3) because the affidavit in support of summary judgment did not contain admissible evidence of the Developer's liability for assessments, interest, and late charges, the Association did not establish a prima facie case against the Developer entitling it to summary judgment.

## FACTUAL AND PROCEDURAL HISTORY

Paradise Isle Associates, a joint venture between the defendants Geupel Construction Company, Inc. and R.G.W. Investment Company, Inc., started a condominium project in northeast Phoenix called The Villas at Hidden Lakes. The Developer recorded

its declaration of horizontal property regime ("Declaration One") on August 30, 1985. The Developer later reworded Declaration One and recorded an amended Declaration on October 11, 1985 ("Declaration Two").

The Developer formed The Villas at Hidden Lakes Homeowner's [sic] Association under Declaration Two in October of 1985. According to Declaration Two, beginning on May 1, 1986, the Developer would pay to the Association monthly assessments on each of the condominium units it owned. Declaration Two also required Developer to make a reserve payment equal to twice the monthly assessment on each unit it owned within sixty days of the date it sold the first unit. Developer conveyed the first unit on April 22, 1986.

On July 24, 1986, after four units had been sold, Developer, acting pursuant to authority granted in Declaration Two, withdrew twenty-three of the original fifty-three units from the project. Developer's position was that it was not required to pay assessments on these twenty-three units until they were rededicated to the project almost five months later.

In October of 1987, after the Developer had sold all condominiums but Unit Six, the Association enacted a late payment penalty and imposed a $10 per unit per month late charge on all past due unit assessments, including the twenty-three units the Developer had withdrawn from the project. According to the Association, upon the enactment of the late charge, the Developer automatically owed $2,170 in late charges for past due assessments.

In November, when the Developer did not meet the Association's October 1987 demand for payment of delinquent assessments, interest, and late charges, the Association claimed an additional $3,070 in late fees. This sum increased each month until July of 1988, when the Association began to charge a flat, monthly late charge of $3,180. By the time the trial court entered judgment, the late fees totalled $47,160. Most of this sum derived from assessments on the twenty-three units Developer withdrew from the project.

The Association sued to recover the unpaid unit assessments, late fees, and interest. In addition, it sought to foreclose a lien on a lot then owned by Developer. Developer counterclaimed, alleging that the lien was invalid and that it did not owe the assessments and late payment fees because it had effectively withdrawn twenty-three of the lots from the project. Alternatively, the Developer asserted that the late fees exceeded the twelve percent interest specified in the Association bylaws for delinquent assessments and were therefore unenforceable.

## THE SEQUENCING OF THE PROJECT

We hold the Developer had the authority to amend the Declaration governing The Villas at Hidden Lakes and that the Developer properly executed and recorded the July 1984 Amendment. Although the Association claimed the Developer should be equitably estopped from enforcing the Amendment, we hold the Association failed to establish a prima facie case of estoppel. Therefore, the trial court erred in granting summary judgment for the Association on this issue. We remand for a determination of whether the Developer is estopped to enforce the Amendment, but we also question the standing of the Association to raise an equitable estoppel claim on behalf of persons who purchased units from Developer.

### 1. Did the Developer Have Authority to Amend the Declaration?

The parties do not dispute that Declaration Two, recorded on October 11, 1985, governs the Villas Development. They also agree that Developer recorded a document on July 24, 1986, to amend this Declaration, and that this document correctly and legally describes The Villas at Hidden Lakes. The Association argues, however, that because the Developer had already sold five units, it did not have authority to "unilaterally" amend the Declaration. This argument is without merit. The issue is not whether Developer had a "unilateral" right to amend, but whether Developer satisfied the provisions for amending the Dec-

laration in the governing Declaration itself. We find that the Developer met these provisions.

The Developer owned more than ninety percent of the subdivision at the time it sought to divide the fifty-three unit project into two phases. Article Fourteen, section three of Declaration Two states that "this Declaration may be amended 'at any time' by an instrument signed by not less than sixty-seven percent (67%) of the Unit Owners." In addition, Article Six, section two of Declaration Two, entitled the Developer to three votes per unit it owned, while only entitling the five other unit owners to one vote per unit. Thus, the Developer had one hundred forty-four votes versus the five votes of the other unit owners and more than enough votes to amend the Declaration.

The Association also argues that the Amendment is invalid because the Developer did not obtain the consent of the mortgage holders to withdraw the units in Phase Two. We disagree. The owners of the units already sold held less than four percent of the votes. Therefore, according to the plain language of Declaration Two, whether these mortgage holders approved or not had no effect on the Developer's right to amend.

Finally, the Association claims that the Developer did not have the authority to "unilaterally" change the fractional interest of each homeowner in the common areas of the subdivision from 1/53 to 1/30. Again, we disagree. The Declaration allows an Amendment that may add or subtract from the total property dedicated to the development. This necessarily results in a change in the overall fractional interest of individual owners. Furthermore, Article One, section four (d) of Declaration Two states: *"Until or unless* changed, each Dwelling shall bear a 1/53 undivided fractional interest in the Common Elements" (emphasis added). Because the Developer had the necessary votes to amend the Declaration to withdraw twenty-three units from the project, it necessarily also had the right to change the fractional interest of the remaining unit owners.

### 2. Did the Mistake Invalidate the Amendment?

■ The Amendment, recorded on July 24, 1986, incorrectly refers to the recorded docket number of the earlier, revoked Declaration of August 1985 (Declaration One) rather than to the docket number of Declaration Two. The Association contends that even if the Developer had authority to amend the Declaration, the entire recorded Amendment is invalid because it contained this mistake. We disagree. We hold the Amendment is valid because it clearly identifies the property and precisely states its purpose, and the Developer re-recorded the Amendment to correct the erroneous reference to the revoked declaration.

The Developer properly executed and acknowledged the July 1986 Amendment. The Amendment stated that it governed specific property, and the Developer attached a full legal description to the document that clearly identified the property. In addition, the Amendment stated its purpose as follows: "WHEREAS, Declarant desires to amend the declaration to provide for a phased development of the Property...."

The parties do not dispute that Developer later corrected the mistake by re-recording the Amendment on September 5, 1986. A notation in the margin of the re-recorded document says the re-recording is solely to correct the improper reference to the revoked Declaration. This re-recording defeats the Association's argument that the incorrect docket number makes the entire Amendment invalid.

Even if the Developer had not re-recorded the Amendment, the Amendment gave sufficient notice to third parties. Under Arizona law, a recorded document stating its terms and purpose imparts constructive notice. Ariz.Rev.Stat.Ann. ("A.R.S.") § 33–416 (provides that recording is notice to all persons);[1] *Carley v. Lee*, 58 Ariz.

---

1. A.R.S. § 33–416 states: "The record of a grant, deed or instrument in writing authorized or

required to be recorded, which has been duly acknowledged and recorded in the proper coun-

268, 272, 119 P.2d 236, 238 (1941) (document gives constructive notice if it sufficiently informs third persons of the nature and substance of rights claimed under it); *Watson Construction v. Amfac*, 124 Ariz. 570, 575–76, 606 P.2d 421, 426–27 (1979) (deed of trust missing two pages still sufficient to "apprise third parties of the nature and substance of the right claimed"). We hold that the mistake did not invalidate the Amendment.

The language of the recorded amendment was clear as to its nature, title, and purpose, and the legal description of the property to which it applied.[2] Titled as an "Amendment," the document explicitly identified the subdivision and purpose of the document.

### 3. Was the Amendment Invalid for Not Applying Equally to Every Lot in the Subdivision?

■ The Association argues the Amendment is invalid because it exempts the twenty-three withdrawn units from monthly assessment payments. According to the Association, such unequal treatment of individual units is unlawful unless one hundred percent of the owners approve. We disagree.

The Association points to three Arizona cases to support its position: *Camelback Del Este Homeowner's Association v. Warner*, 156 Ariz. 21, 749 P.2d 930 (App. 1988); *Riley v. Boyle*, 6 Ariz.App. 523, 434 P.2d 525 (1967); and *La Esperanza Townhome Association, Inc. v. Title Security of Arizona*, 142 Ariz. 235, 689 P.2d 178 (App. 1984). In each of these cases, the court held the attempted amendments were invalid for failing to treat all units uniformly. These decisions, however, do not establish a general principle that a condominium's governing declaration may *never* permit amendments that do not apply equally to

every unit. Rather, each case construed specific limiting language in the respective declarations. The court, in *Camelback Del Este v. Warner*, highlighted this distinction: "*[U]nless otherwise provided for in the restrictions themselves*, any amendment to restrictive covenants, must apply to every lot." 156 Ariz. at 27, 749 P.2d at 936 (emphasis added; citations omitted). In this case, the Declaration has no such limiting language.

Unlike *Riley, La Esperanza* and *Camelback*, the Amendment does not affect the restrictions or covenants at all; it merely provides for the development of the project in phases. Although the twenty-three units were temporarily withdrawn from the project, the governing declarations did not exempt those units from any covenant or restriction. All the restrictions and covenants would apply when the Developer rededicated the twenty-three units to the development.

### 4. Was Withdrawal of Phase Two Lots An Improper Termination of the Horizontal Property Regime As to Those Lots?

■ The Association argues that the Declaration requires "approval of all the Owners of the units" in order to terminate the horizontal property regime.[3] It contends withdrawal of the twenty-three units without the approval of the five individual unit owners made this an unauthorized termination. We disagree.

The Amendment at issue clearly distinguishes between withdrawing a portion of the property from the project and terminating the horizontal property regime entirely. Although termination of the regime requires one hundred percent owner approval, withdrawal of property requires only sixty-seven percent of the votes of the owners. Because it is a less drastic step, with-

---

ty, shall be notice to all persons of the existence of such grant, deed or instrument...."

**2.** The Amendment states: "This Amendment to Declaration of Horizontal Property Regime Together with Covenants, Conditions and Restrictions for The Villas at Hidden Lake Condominiums is made this 18th day of July, 1986 by

Paradise Isle Associates, an Arizona joint venturer ('Declarant')."

**3.** Declaration Two, Article Ten, section one states: "[T]he Horizontal Property Regime created by the recording of this Declaration may only be terminated with the approval of all of the Owners of the Units."

drawal simply requires fewer votes for approval than does termination.

When interpreting a document, we will construe provisions to harmonize rather than to conflict if sound reasons exist to do so. *LeBaron v. Crismon*, 100 Ariz. 206, 209, 412 P.2d 705, 707 (1966). Applying this principle, we find the termination and withdrawal provisions are consistent. Therefore, we hold that withdrawal of property in Phase Two without the consent of the five unit owners did not unlawfully terminate the horizontal property regime.

5. *Is the Developer Estopped From Asserting It Does Not Owe Monthly Assessments on the Twenty–Three Units in Phase Two Withdrawn by the Amendment?*

■ The Association next contends Developer is estopped from claiming that no assessments were due on the twenty-three withdrawn lots in Phase Two. We hold that the Association did not establish a prima facie case of equitable estoppel, and the trial court erred in granting summary judgment for two reasons. First, the original Declaration gave constructive notice that the owners holding "sixty-seven (67%) of the votes in the association" could consent to withdrawal of units from the development. Second, and more importantly, neither the Association nor the five unit owners presented admissible evidence that they suffered any injury from the withdrawal of the twenty-three lots in Phase Two. Therefore, we remand to the trial court.

■ The doctrine of equitable estoppel is not applicable unless one is injured by justifiably relying upon conduct of another intended to induce such reliance. *Heltzel v. Mecham Pontiac*, 152 Ariz. 58, 60–61, 730 P.2d 235, 237–38 (1986). In order to sustain the summary judgment on the issue of estoppel, the Association had to show the absence of any factual conflict and the right to judgment as a matter of law. *United Bank of Arizona v. Allyn*, 167

Ariz. 191, 197, 805 P.2d 1012, 1018 (App. 1991). We conclude the Association did not meet that burden.

The Association bases its claim of estoppel on representations made to the first five unit purchasers by Developer's sales agents that Developer would pay the monthly assessment for each unsold lot in the subdivision. The Association argues that withdrawal of the twenty-three lots reduced the Developer's monthly contribution by $1,725. It argues that this reduction had a "deleterious effect upon the care and maintenance of the Subdivision ... particularly the common areas." The Association, however, does not point out how the withdrawal of Phase Two impaired the "care and maintenance of the Subdivision." The Association incurred no obligation to maintain any portion of Phase Two during the time Phase Two was withdrawn. Furthermore, the Developer remained liable during this period for monthly assessments on all units it owned in Phase One.

Contrary to the Association's argument, the withdrawal of units in Phase Two did not increase the financial obligation of the owners of units in Phase One to pay for the "care and maintenance" of the common areas in Phase One. Thus, the Association did not establish by affidavit or other competent evidence either justifiable reliance upon the representations made by Developer's agents or injury resulting from withdrawal of the units in Phase Two.

## THE LATE FEE PENALTY

1. *Did the Association Have the Authority to Impose Late Fees?*

■ Both Declaration Two and A.R.S. section 33–1242 of the Uniform Condominium Act (UCA) support the Association's right to charge late payment penalties on overdue assessments.

Article Five, section one is the only authority in Declaration Two for assessment of late fees.[4] That section states that the

---

4. *Section 1.*
PERSONAL OBLIGATION OF ASSESSMENTS. The Declarant, for each Dwelling owned within

the Property, hereby covenants, and each Owner, by acceptance of a deed, except as provided for in this Article, whether or not it shall be so

assessments, "late payment penalties, if any, together with interest, costs, and reasonable attorney's fees," shall be a lien upon the unit. In addition, Arizona's UCA, A.R.S. section 33–1242, provides:

> Subject to the provisions of the declaration, the association may:
>
> . . . .
>
> 11. Impose charges for late payment of assessments and, after notice and an opportunity to be heard, impose reasonable monetary penalties upon unit owners for violations of the declaration, bylaws and rules of the association.

The Developer argues that this section does not give the Association authority to impose late fees in excess of the contractual twelve percent interest rate because the UCA only applies to condominiums created after January 1, 1986. *See* A.R.S. § 33–1201(A) (establishing effective date of UCA). The Developer points out that the Association filed its governing declaration (Declaration Two) before the effective date of the UCA.

The UCA, however, "applies to condominiums created within this state before the effective date of this chapter to the extent the provisions of this chapter are not in conflict with chapter 4.1 of this title. . . ." A.R.S. § 33–1201(B). Chapter 4.1 (which is former A.R.S. sections 33–551 through 33–561, repealed by the current UCA) contains no language that prevents the assessment of late charges by a condominium homeowner's association. Therefore, the Association had authority under section 33–1242 to impose late fees.

The Developer argues, nevertheless, that even if the UCA applies, the Association may not exercise rights authorized by section 33–1242(11) because this section is expressly "[s]ubject to the provisions of the declaration." The Developer never tells us where the Declaration expressly prohibits the imposition of late charges. We have carefully reviewed Declaration Two and find no such prohibition. Thus, we conclude the Association may exercise the powers granted to it in the Declaration and in A.R.S. section 33–1242(11).

### 2. Was the Developer Personally Liable for Late Fees?

■ Count One of the Association's complaint claimed that Developer was personally liable for late charges on delinquent assessments. The Developer argues Declaration Two excludes late payment penalties from the list of items that may become a personal liability of an owner. The Developer also argues the Association's exclusive remedy is a lien against each lot for the amount of the late charges. Based on our interpretation of Declaration Two, we hold that the Declaration creates a personal obligation for late fees and that a former owner may be personally liable for such charges.

Article Five, section one, of Declaration Two, provides in part:

> *Section 1.* PERSONAL OBLIGATION OF ASSESSMENTS
>
> . . . .
>
> The annual, special and supplemental assessments, *late payment penalties*, if any, together with interest, costs, and reasonable attorney's fees, shall be a lien upon the Unit as created by the Articles

---

expressed in such deed, is deemed to covenant and agree to pay to the Association: (1) annual assessments (paid as provided herein) for commonly metered utilities, insurance, maintenance, management, utilities for common areas, and other general expenses including reserves for contingencies, maintenance, repair and replacement, hereafter referred to as "annual assessments;" (2) special assessments for capital improvements; and (3) supplemental assessments. Such assessments are to be established and collected as provided in this Declaration, Articles and By-Laws. The annual, special and supplemental assessments, *late payment penalties*, if any, together with interest, costs, and

reasonable attorney's fees, shall be a lien upon the Unit as created by the Articles or By-Laws. Each such assessment, together with interest, costs, and reasonable attorney's fees, shall also be the personal obligation of the person who was the Owner of such Unit at the time the assessment was levied. The personal obligation for delinquent assessments shall not pass to successors in title unless expressly assumed by them, or unless prior to the transfer of title as evidence by the records of the County Recorder or other appropriate governmental agency, a lien for such assessment shall have been filed or recorded. (Emphasis added.)

or By–Laws. *Each such assessment,* together with interest, costs, and reasonable attorney's fees, shall also be the personal obligation of the person who was the Owner of such Unit at the time the assessment was levied.

(Emphasis added.) Developer argues the exclusion of late payment penalties from the list of items in the second sentence clearly signifies that such payments may not become a personal liability of an owner. We reject this argument.

First, the title of this section, "Personal Obligation of Assessments," says that the assessments specified in section one are meant to be the personal obligation of the lot owner. Second, the four kinds of assessments specifically listed in the first sentence are collectively referred to in the second sentence as "each such assessment." Both sentences merely describe the same four assessments in different ways. We hold, therefore, that the words "each such assessment" in the second sentence refer to and include the assessment for late fees listed in the first sentence and personally bind the lot owners.

*3. Were the Late Fees Reasonable?*

■ Although the Association by Declaration and statute has the power to impose charges for late fees, it cannot abuse its discretion or exercise its power unreasonably. We hold that because the Association had not adopted a schedule of penalties for late payments at the time the Developer's assessments became delinquent, the retroactive imposition of monetary penalties on such assessments was unreasonable.

The Association adopted the late charge in October 1987, and applied it to monthly assessments already delinquent. The Association calculated the late charge by multiplying the number of units owned by Developer by the number of months Developer owned each unit. It then multiplied the product of this calculation by the $10 late fee. According to the Association, at the moment it adopted the late charge penalty, Developer was automatically liable for

$2,170 in late charges for past delinquencies. Thus, in November, the month following adoption of the late charge, instead of charging a late fee of $520 for fifty-two delinquent assessments,[5] the Association assessed the Developer a late payment penalty of $3,070. The Association claimed a similar sum for each following month in which the pre-October 1986 assessments were unpaid. Fifteen months later, according to the Association, the Developer owed $47,160 in late charges.

The Developer contends the Association had no statutory or contractual power to impose late fees in excess of the twelve percent interest specified in the governing bylaws. We disagree. Article Five, section one of the Declaration and A.R.S. section 33–1242(11) clearly give the Association the power to impose charges for late fees and interest. Nevertheless, we find that neither the language of the Declaration authorizing the imposition of "late payment" fees nor the provisions of A.R.S. section 33–1242 empower the Association to assess unreasonable late payment fees.

Courts have regularly imposed a reasonableness standard on rules and regulations adopted by condominium homeowners' associations. *See, e.g., Makeever v. Lyle,* 125 Ariz. 384, 388, 609 P.2d 1084, 1088 (App. 1980) (condominium associations may exercise broad powers "if they are not arbitrary and capricious, bearing no reasonable relationship to the fundamental condominium concept"); *Ryan v. Baptiste,* 565 S.W.2d 196, 198 (Mo.App.1978); *Rhue v. Cheyenne Homes, Inc.,* 449 P.2d 361, 363 (Colo.1969) (refusal of committee to approve house plans must be reasonable and not arbitrary and capricious); *see also Chateau Village North Condominium v. Jordan,* 643 P.2d 791, 792 (Colo.App.1982); *Unit Owners Ass'n of Buildamerica–1 v. Gillman,* 223 Va. 752, 292 S.E.2d 378, 386 (1982) ("[A]mendments to condominium restrictions, rules and regulations should be measured by a standard of reasonableness, and ... courts should refuse to enforce regulations that are found to be unreasonable.");

---

**5.** The Association made no claim for assessments on Unit 33, the first unit sold.

*Worthinglen Condominium Owners' Ass'n v. Brown,* 57 Ohio App.3d 73, 76, 566 N.E.2d 1275, 1277 (1989) (If, in the context of surrounding circumstances, the amendment is unreasonable, arbitrary or capricious, it is invalid.).

We note that late charges are ordinarily imposed in connection with an installment debt. There, the late payment penalty, usually a flat fee or percentage of the installment due, is set forth in the loan documents. The obligor knows, in advance of the due date, that a late charge in a sum certain will be assessed for each late payment. In an installment debt, the obligor can choose between paying on time or paying late and incurring a specific late charge.

Here, however, although the Association always had the power to enact a late payment penalty, it did not do so until October, 1987. Before that date, the Association did not require an owner to make a choice between making a timely monthly assessment payment and incurring a late penalty for failing to make a timely payment. We conclude that an owner who may have acted on the premise that the Association's only penalty for late payment of a monthly assessment was an interest charge of 12%, and who might have timely paid the monthly assessment rather than a late payment penalty, should not be subject to a late payment charge enacted many months after the date of delinquency. For that reason, we hold that, as a matter of law, the Association's imposition of a retroactive late fee was unreasonable, arbitrary, and an abuse of discretion.

Thus, the Association cannot use assessments delinquent before October 1987, as the base for post-October late payment calculations. We strike all late fees imposed on assessments delinquent before October 1987, and remand to the trial court for a recalculation of the late fees.

## SUMMARY JUDGMENT ON COUNT ONE: ASSESSMENTS, RESERVES, INTEREST, LATE FEES AND SALE ESCROW FUNDS

The Developer contends that summary judgment on Count One was improper because of the existence of issues of fact. We agree. We hold that the Association did not show by competent evidence a prima facie case entitling it to summary judgment against the Developer for $77,744.95, in unpaid assessments, late fees, interest, and sale escrow funds.

### 1. Did the Association Establish a Prima Facie Case for Summary Judgment?

The initial burden of establishing the elements of summary judgment rests with the moving party. *Nelson v. Cannon,* 126 Ariz. 381, 385, 616 P.2d 56, 60 (App.1980). A movant who will bear the burden of proof at trial must show a prima facie case, and only then does the burden shift to the opponent to prove the existence of a dispute. *GM Dev. v. Community Am. Mortg.,* 165 Ariz. 1, 5, 795 P.2d 827, 831 (App.1990).

Where the movant relies on an affidavit to support the motion, the affiant must by personal knowledge show both competency to testify about the matters in the affidavit and state facts that would be admissible evidence. Ariz.R.Civ.P. 56(e); *Portonova v. Wilkinson,* 128 Ariz. 501, 502, 627 P.2d 232, 233 (1981). *See also* Ariz.R.Evid. 901(b)(1) (authentication requires "[t]estimony that a matter is what it is claimed to be").

The affidavit of Wallace Neal, submitted by the Association in support of its motion for summary judgment, did not comply with either requirement of Rule 56. It neither set forth facts admissible in evidence nor affirmatively established Neal's competence to testify to the liability of the Developer for the damages claimed by the Association.

The Association attached computer-generated exhibits to support its motion for summary judgment. The affidavit states essentially that Neal is the president, and based upon his personal knowledge and information, the Developer owes $77,744.95 for unpaid assessments, late fees, and interest on other units in the development.

The summaries and exhibits referred to in the affidavit consist of four computer-generated exhibits that contain no information about their preparation.[6]

Although Neal states he made the affidavit on personal knowledge, he does not lay a foundation for either the admission in evidence of the exhibits or the admission of his conclusions based on the exhibits. The affidavit does not say that Neal ever reviewed the exhibits or that he is familiar with the person who prepared them or the manner in which they were prepared. We conclude that Neal's affidavit did not affirmatively show that he was competent to testify to any conclusions derived from the exhibits attached to the affidavit. *See Chess v. Pima County*, 126 Ariz. 233, 235, 613 P.2d 1289, 1291 (App.1980) (affidavit does not comply with Rule 56(e) when "it contains conclusions and fails to show that the affiant is competent to testify to the matters stated therein"); *Heiner v. City of Mesa*, 21 Ariz.App. 58, 62–63, 515 P.2d 355, 359–60 (1973) (affidavit did not comply with Rule 56(e), Ariz.R.Civ.P., because the affiant did not show personal knowledge and competency to testify).

Similarly, the affidavit did not recite facts that are admissible evidence. The conclusory facts Neal provided were based on computer-generated exhibits that are inadmissable hearsay. Ariz.R.Evid. 801(a) and (c). The Neal affidavit does not establish that these exhibits fall within the business records exception to the hearsay rule. Ariz.R.Evid. 803(6). *Transamerican Ins. Co. v. Trout*, 145 Ariz. 355, 360, 701 P.2d 851, 856 (App.1985) ("The fact that [one keeps] the reports among [one's] own business records does not make the documents 'business records' within the contemplation of the rule.").

### 2. Does the Association Owe Assessments?

 Because we held the Amendment properly divided the condominium project into two phases for development, we reverse the trial court's ruling that monthly assessments were due on the twenty-three withdrawn units from July 24, 1986, through December 1986. We note, however, that these units were not withdrawn until July 24, 1986, and thus were subject to monthly assessments from May 1, 1986, through July 24, 1986. Upon remand, the trier of fact shall determine what sum, excluding late fees, the Developer owes for monthly assessments and interest on the units in Phase Two during this period.

Whether the Developer owed assessments and late fees after October 1987, is also a material issue of fact. We, therefore, reverse the granting of summary judgment on this issue and remand to the trial court to determine whether any assessments or late fees are due after October 1987.

### 3. Is the Developer Entitled to Credits or Offsets?

 In addition, the parties dispute the amount of credits or offsets against the late fee penalty to which the Developer is entitled. Because Developer does not owe any assessments for the units in Phase Two during the period those units were withdrawn from the project it is not entitled to offsets or credits for the amounts it paid in insurance, maintenance, and other costs for Phase Two during this same period.

### 4. Are There Other Issues of Material Fact Precluding Summary Judgment?

 We find that other disputed issues of fact exist about the escrow and additional charges alleged to be due and owing by Developer. For example, the parties dispute the total amount of assessments Developer has already paid. Developer's affidavits show payments totalling $21,181.73; the Association contends that payments

---

6. The first exhibit is "Monies Owed by [Developer] for Unit # 6" from April 1986 through February 1989. The second is "Assessments Owed by [Developer]" from 1986 through May 1988. The third is "Assessments and Reserves Owed by [Developer]" from the escrow sales of each of the fifty-three lots. The fourth calculates all of the "Money owed and paid by [Developer]" from April 1986 through February 1989.

from Developer totalled only $15,385.00. Further, although the Association claims the Developer owes $14,400 from the sales escrow accounts, the Association did not make a prima facie case for summary judgment on that issue. We remand these issues to the trial court.

## SUMMARY JUDGMENT ON COUNT TWO: THE LOT SIX CLAIMS

The trial court granted summary judgment for the Association on Count Two of the complaint and awarded $6,834.00 plus accruing monthly charges of $301.15. These amounts consisted of alleged overdue assessments and late charges relating to Lot Six. The court also ruled that the lien, which the Developer recorded and then re-recorded against Lot Six, was valid and ordered that the sheriff sell the property. Finally, the trial court dismissed the Developer's wrongful lien complaint and counterclaim against the Association and Wallace Neal.

### 1. Was the Association Entitled to Summary Judgment on Overdue Assessments and Late Charges on Lot Six?

█ We hold the trial court erred by granting summary judgment as to Lot Six. First, the affidavit of Wallace Neal did not establish by competent evidence the Developer's indebtedness for overdue assessments and late charges. Second, the trial court counted the charges on Lot Six twice in calculating damages to the Association. It erroneously included the sum of $6,384.00 awarded under Count Two, in the Count One damage award of $77,744.95. Third, the twenty-three lots in Phase Two that were withdrawn from the project included Lot Six. Thus, under our holding, Developer owed no assessments, late charges, or interest on Lot Six for the period July 24, 1986, through December 1986. We remand to the trial court to determine the indebtedness on Lot Six.

### 2. Was the Lot Six Lien Valid?

█ The last sections of the judgment dismiss Developer's counterclaim against the Association and its complaint against Wallace Neal. The Association's counterclaim and complaint (referred to later as the "counterclaims") are based on A.R.S. section 33–420, which imposes certain penalties for the recording of an invalid lien against real property. Both counterclaims consist of essentially the same claim against different defendants. Both seek damages based on the alleged improper filing of a lien on Lot Six. The trial court found that the lien was valid and enforceable and did not rule on Developer's section 33–420 argument.

On appeal, Developer contends that the trial court erred in finding that the lien was valid because the Association "materially misstated" the amount due in assessments and late fees on Lot Six. We agree with the Developer that a question of fact exists on this issue. Thus, we need not address the Developer's remaining arguments about the validity of the lien.

### 3. Was There a Valid Tender of the Amounts Due on Lot Six?

█ The Association contends that the Developer was delinquent in its assessments on Lot Six for $1,439.25 as of the date of the October lien. In calculating this amount, the Association included monthly assessments of $75, plus twelve percent interest from May 1986, through October 1987. On October 12, 1987, the Association sent a letter to the Developer demanding payment in the amount of $26,-208.87. The letter, however, offered no explanation or itemization of the claim. In a letter to the Association dated November 3, 1987, the Developer claimed that its records showed it was only delinquent on Lot Six assessments from April 1987. The Developer also enclosed a check for $600 to cover that period with a request that the Association waive any interest or penalty. The Association rejected this payment and recorded a lien in the amount of $1,439.25 on November 5, 1987.

Because the July 1986 Amendment permitted the development of the project in two phases, Lot Six, as a part of Phase Two, was properly withdrawn from the development. The Developer did not sell the

first lot in Phase Two to an individual owner until October of 1986. Because assessments did not begin until sixty days later, Developer did not owe a $75 monthly assessment on Lot Six from August 1986 through December 1986.

Developer admits being overdue in assessments on Lot Six from April through November 1987. It argues, however, that it unconditionally tendered a check for $600 to cover those assessments. It further argues that the Association's refusal of the check, even as a partial payment, and the Association's later inclusion of that amount in their lien, resulted in an unlawful inflation of Developer's liability. Developer cites *Peterson v. Central Ariz. Light and Power*, 56 Ariz. 231, 237, 107 P.2d 205, 208 (1940), for the proposition that the legal effect of Developer's unconditional tender is to relieve it from payment of late fees and charges on Lot Six.

The Association contends the $600 check was a conditional tender and acceptance of the $600 would have resulted in a waiver of its right to any payment more than $600. The Association argues it was justified in including the $600 with the calculation of overdue assessments and in continuing to add further interest and late fees because it never accepted the check. Although the Association is correct that to be valid, a tender must be unconditional, *Pleasant v. Ariz. Storage and Distributing Co.*, 34 Ariz. 68, 78, 267 P. 794, 798 (1928), the Association offered no evidence to substantiate its claim that the tender of payment was conditional.

Whether the Association has a lien on Lot Six and, if so, the amount of the lien are fact issues. Whether the Developer's tender was unconditional is also a disputed question of fact. We remand these issues to the trial court.

Furthermore, we cannot determine as a matter of law whether the Association wrongfully asserted the lien. Thus, we do not reach the question of the Association's possible liability under A.R.S. section 33–420 for filing a groundless lien. If the lien against Lot Six is valid, the question of the Association's liability under section 33–420

becomes moot. If, on the other hand, the lien was groundless when filed, the trier of fact must then determine whether the Association is liable for damages under section 33–420.

## ATTORNEY'S FEES

We determine that summary judgment was improper on both counts of the complaint and reverse the trial court's award of attorney's fees to the Association. The Developer has requested attorney's fees pursuant to Rule 21(c), Arizona Rules of Civil Appellate Procedure. An award of attorney's fees is appropriate even where we have not entered a final judgment. *Wagenseller v. Scottsdale Memorial Hosp.*, 147 Ariz. 370, 393–94, 710 P.2d 1025, 1048–49 (1985). We grant the Developer's request for attorney's fees in this appeal. Pursuant to Rule 21(a), Arizona Rules of Civil Appellate Procedure, Developer has ten days to file its affidavit of costs and attorney's fees with this court.

## CONCLUSION

Based on the foregoing, we reverse the trial court's grant of summary judgment on all counts and remand for proceedings consistent with this opinion.

TAYLOR, P.J., and GRANT, J., concur.