IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

EVANGELOS ARMIROS, *Plaintiff/Appellee/Cross-Appellant*,

*v.*

JULIE R ROHR, *Defendant/Appellant/Cross-Appellee*.

No. 1 CA-CV 16-0755
FILED 3-8-2018

Appeal from the Superior Court in Maricopa County
No.  CV2014-003314
The Honorable Randall H. Warner, Judge

**AFFIRMED IN PART; DISMISSED IN PART**

COUNSEL

Zimmerman Reed LLP, Scottsdale
By Charles S. Zimmerman
*Counsel for Defendant/Appellant/Cross-Appellee*

Yetnikoff Law Offices PLLC, Scottsdale
By Isidore Yetnikoff
*Counsel for Plaintiff/Appellee/Cross-Appellant*

---

## OPINION

Presiding Judge Randall M. Howe delivered the opinion of the Court, in which Judge Kenton D. Jones and Judge James B. Morse Jr. joined.

---

H O W E, Judge:

¶1        Julie Rohr appeals the trial court's granting of summary judgment to Evangelos Armiros holding that a contract existed between them and that Julie[1] breached it. Julie also appeals the trial court's $135,250 damages award to Evangelos following a bench trial. Evangelos cross-appeals, arguing that the court erred by dismissing Julie's husband, Daniel Rohr, as a defendant. We affirm the trial court's finding that a valid contract existed when Julie offered her diamond ring on eBay with the option for users to "Buy It Now" and Armiros accepted the offer by clicking the "Buy It Now" button. We also affirm the trial court's finding that, although Evangelos had not paid for the ring before Julie breached the contract, he was entitled to the benefit of the bargain and suffered damages. We further hold that Evangelos's cross-appeal against Daniel must be dismissed because Daniel is not an appellant for purposes of this appeal.

## FACTS AND PROCEDURAL HISTORY

¶2        In February 2014, Julie listed a 10.17 carat diamond ring for sale on eBay for $100,000 using the "Buy It Now" option. Evangelos, a Georgia resident and sole owner of E-Diamond, LLC, saw Julie's listing and emailed her about the ring. Julie provided Evangelos with the ring's Gemological Institute of America ("GIA") report number and stated that she was the ring's original owner. Evangelos again emailed Julie stating that "[i]f we have a deal, would you be willing to meet face to face at your bank or attorney to do the transaction?" After Julie agreed, Evangelos clicked the "Buy It Now" button on the listing page but was temporarily unable to complete the purchase because eBay requested that he first confirm his identity. While on hold with eBay, Evangelos emailed Julie and asked that she hold the ring until he could make the purchase; Julie stated

---

[1]        For clarity and convenience, we refer to each of the parties by their first name as certain parties share a same last name.

that she would try. After eBay cleared Evangelos to purchase the ring, he clicked the "Buy It Now" button, which closed Julie's listing.

¶3 Shortly after Evangelos clicked the "Buy It Now" button, he and Julie arranged a time to meet in Phoenix to complete the transaction, and he purchased an airplane ticket from Georgia to Arizona. Evangelos then emailed Julie through eBay stating that he was bringing a friend with more experience because "this is an expensive one to screw up[.]" Julie and Evangelos later texted each other confirming when and where they would meet.

¶4 Even though Julie's original eBay listing had closed, she received an email later that evening from another eBay user offering $150,000 for the ring. Julie responded that she believed she had already sold the ring. The eBay user told Julie that he would make a deposit on the ring and that his $150,000 offer was "well worth canceling the deal with [Evangelos]." Julie accepted the other user's offer and emailed Evangelos advising that she would no longer sell him the ring. She also texted him that she was sorry, but the other buyer offered her more money and that completing the transaction would be easier with the other buyer. Julie subsequently sent Evangelos a cancelation request through eBay and listed her reason as, "I made a mistake in my listing price." Evangelos denied Julie's cancelation request, stating that the two had a valid contract for the ring's purchase.

¶5 The next day, Evangelos called and texted Julie several times to change her mind, telling her that they had a legal contract and that he would have to go "the legal way" because she did not want to work it out. Evangelos then offered Julie $150,000 for the ring, but she declined, stating that she had decided to keep the ring and not sell it, even though she had already agreed to sell the ring to the other buyer.

¶6 Two months later, Evangelos sued Julie and Daniel (collectively, "the Rohrs") for breach of contract and breach of the covenant of good faith and fair dealing. Evangelos also named as a defendant the other buyer who had purchased the ring, but the buyer was dismissed as a party and subsequently settled by paying Evangelos $60,000. Daniel moved to be dismissed from the lawsuit, arguing that although he had originally purchased the ring as an engagement ring for Julie in 2005, he currently had no property interest in the ring and was not a party to Julie and Evangelos's eBay transaction. The trial court denied Daniel's motion as premature.

¶7 In January 2016, Evangelos moved for summary judgment. He attached to his motion relevant portions of eBay's user agreement to show that a valid contract existed. The attached eBay user agreement stated that "[y]ou agree to comply with all the above when accessing or using our Services." It also stated that a user must be able to form a legally binding contract and that the actual contract for sale was directly between the seller and buyer. Under the "Purchase Conditions" section, the user agreement stated that buyers agree that a "legally binding contract" is entered when an item is bought or the buyer has the winning bid. After a buyer clicks the "Buy It Now" button, the buyer is "obligated" to complete the transaction and must send payment to the seller within three days. The user agreement also set a monetary limit on when a seller can request immediate payment on items less than $10,000 and allowed the buyer to pay "by any method the seller accepts" if the buyer picked up the item in person.

¶8 The Rohrs cross-moved for summary judgment, asserting that no enforceable contract existed and that Evangelos had no provable damages. After hearing oral argument, the court found that both Julie and Evangelos agreed to be bound by eBay's user agreement and that listing an item under the "Buy It Now" option obligates the seller to sell the item to the "Buy It Now" buyer for the listing's specified price. Consequently, the court found that a binding contract existed. The court held that "[t]he written contract is an unambiguous manifestation of mutual assent: [Julie] offered to sell for $100,000 and [Evangelos] accepted the offer" but that Julie repudiated the contract before the time for payment. The court denied Evangelos's request for summary judgment on damages, however, because the amount of damages was disputed.

¶9 In August 2016, the court held a one-day trial on damages. Before the presentation of evidence, Julie argued that Evangelos sought only lost profits damages and not damages under the Uniform Commercial Code ("UCC"), representing the difference in market value at the time of breach and the contract price for the ring. Evangelos responded that he had alleged UCC damages in his original complaint and the pretrial statement and therefore had the right to elect which type of damages he was pursuing, and he was pursuing UCC damages under A.R.S. § 47–2713(A). The court agreed that the damages sought to that point in the litigation were phrased in terms of lost profits but that "the law of contracts has always been that for a purchase and sale contract, the measure of damages is benefit of the bargain." The court advised the parties that it would address the measure of damages following trial.

¶10          At trial, Evangelos testified that he had the ability to purchase the $100,000 ring and that he had intended to complete the transaction in Phoenix. Evangelos also testified that he had $155,000 available to him from a home equity line of credit. He further testified that the reason he wanted to bring his friend was to ensure that the diamond was the same as the one that Julie had advertised and not a fraud. Evangelos's gemologist testified about Rapnet, an international network that producers and wholesalers use to sell diamonds at diamond exchanges. He testified that the price listed on Rapnet for a diamond is the price a buyer would actually pay. To determine the fair market value of Julie's ring, the expert conferred with colleagues in the industry and had found three similar rings listed on Rapnet ranging in price from $372,000 to $402,000. Additionally, the expert stated that one of the rings he found, listed for $389,000, appeared to be a little smaller than Julie's ring, but that after comparing the two GIA reports, he believed the diamond listed on Rapnet was Julie's ring.[2] Lastly, he testified that the platinum setting and smaller diamonds that surrounded the ring in its setting had a market value of $3,500.

¶11          The court then heard evidence from Julie's gemologist. He testified that he had not been asked to determine the ring's market value. He stated that "Rapnet may be a shadow of the market. It is not the actual market." He further testified that market value should be determined by actual transactions and not asking prices—like those on Rapnet. The expert conceded that the diamond listed on Rapnet for $389,000 was the same diamond in question, albeit slightly smaller. Although the expert did not opine on the ring's market value, he did provide a report on two-carat diamonds listed on Rapnet to show that prices varied up to 25%.

¶12          The Rohrs testified next. Daniel testified that he and Julie went to New York together to pick out an engagement ring. Julie picked the ring she liked and Daniel purchased it for $166,765. Daniel stated that although the two had a prenuptial agreement, it did not address the ring. Daniel testified that he did not participate in the eBay transaction and did not communicate with either Evangelos or the other eBay user. Julie testified that Evangelos made her uncomfortable and that she was scared to meet with him in person. She stated that she lied to Evangelos when she told him that she was no longer selling the ring to the other buyer and that

---

[2]      The expert testified that the original GIA report for Julie's ring showed three inclusions in the diamond and that the new GIA report for the diamond listed on Rapnet cited two of the same inclusions. As such, the expert concluded that the other buyer had removed one of the inclusions in Julie's ring, which caused the diamond's weight to slightly decrease.

she "was going to tell him anything [she] could . . . to make him go away." She testified further that she did not believe that a contract existed after Evangelos clicked the "Buy It Now" button because he did not give a deposit. She stated, however, that she "didn't realize [she] should have [requested a deposit] in the eBay listing."

¶13            Following trial, the court found that Evangelos was entitled to the benefit of his bargain and that even though the term lost profits was used in the parties' summary judgment briefing and pretrial statement, "[t]he pretrial statement makes clear that [Evangelos] was seeking the difference between the ring's value and the contract price." In determining the ring's value, the court found that Julie grossly undervalued the ring on her listing and that the other eBay buyer subsequently listed the same ring on Rapnet for $389,000. The court concluded that although Evangelos's expert testified that $389,000 was the ring's market value, that price was just a listing price and "therefore likely higher than the ring's true market value." To calculate the ring's market value, the court started with the $389,000 listing price and reduced it 25% based on Julie's expert's Rapnet report, resulting in a $291,750 market value. It further found that the platinum setting and smaller diamonds had a $3,500 value and therefore the ring's total value at the time Julie breached was $295,250. The court then subtracted the $60,000 Evangelos received from the other buyer and the $100,000 Evangelos would have had to pay to purchase the ring, thereby resulting in damages of $135,250.

¶14            The court also found that Daniel had given the ring to Julie as a gift before they were married and that they never comingled it with the couple's community property. Therefore, the ring was Julie's sole and separate property. Consequently, the court held that the Rohrs' marital community was not liable for the breach and dismissed Daniel from the case.

¶15            Evangelos requested his attorneys' fees, taxable costs, and expert witness fees. The court denied Evangelos's request for attorneys' fees but awarded his costs. The court also awarded Evangelos's request for expert witness fees under Arizona Rule of Civil Procedure 68(g). Julie moved for a new trial, which the court subsequently denied. After the court denied her request for a new trial, Julie timely appealed. Evangelos timely cross-appealed.

## DISCUSSION

### 1. Contract Formation and Breach of Contract

¶16          Julie argues that the trial court erred by granting summary judgment to Evangelos on the contract formation and breach of contract issues. She contends that a contract did not exist because the two did not have a meeting of the minds. "We review a grant of summary judgment de novo and view the facts in the light most favorable to the non-moving party." *Wickham v. Hopkins*, 226 Ariz. 468, 470 ¶ 7 (App. 2011). Summary judgment is appropriate when no material issues of fact exist and the moving party is entitled to judgment as a matter of law. Ariz. R. Civ. P. 56; *Orme Sch. v. Reeves*, 166 Ariz. 301, 305 (1990). Additionally, the validity and enforceability of a contract is a mixed question of law and fact, which we review de novo. *Estate of Decamacho ex rel. Guthrie v. La Solana Care and Rehab, Inc.*, 234 Ariz. 18, 20 ¶ 9 (App. 2014). Because no material issues of fact exist, the trial court did not err by granting summary judgment.

¶17          The UCC applies to contracts for the sale of goods. A.R.S. § 47–2102. Under the UCC, "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." A.R.S. § 47–2204(A). "For an enforceable contract to exist, there must be an offer, an acceptance, consideration, and sufficient specification of terms so that obligations involved can be ascertained." *K-Line Builders, Inc. v. First Fed. Sav. & Loan Ass'n*, 139 Ariz. 209, 212 (App. 1983). Here, both parties agreed to abide by eBay's user agreement before using eBay's services. Julie made an offer by listing her ring with the "Buy It Now" option and inviting anyone who clicked the "Buy It Now" button to enter into a contract. Evangelos accepted the invitation by clicking the "Buy It Now" button, thereby entering into a "legally binding contract" pursuant to eBay's user agreement. Julie's eBay listing contained all the agreement's terms and the consideration, namely, that Evangelos would receive the 10.17 carat diamond ring and Julie would receive $100,000. As such, an enforceable contract existed and summary judgment was appropriate.

¶18          Julie argues that the requisite meeting of the minds sufficient to form a contract did not exist. This argument is not persuasive. While Julie is correct that the parties must have intended to be bound by the agreement for a valid contract to exist, *see Goodman v. Physical Res. Eng'g, Inc.*, 229 Ariz. 25, 28 ¶ 7 (App. 2011), both Julie and Evangelos were experienced eBay users who understood how to sell and purchase items through eBay. The user agreement both parties agreed to be bound by discussed the different

ways in which a buyer can acquire an item, either by bidding or clicking "Buy It Now." Had Julie wanted her listing to simply solicit offers for her ring, she could have allowed only open bidding and not a fixed "Buy It Now" price of $100,000. By posting the ring with the "Buy It Now" option, Julie expressed her intention to enter into a contract with anyone that clicked the "Buy It Now" button. Likewise, Evangelos knew that by clicking the "Buy It Now" button he would obligate himself to purchase the ring according to the listing's terms.

¶19 Julie counters that Evangelos did not intend to buy the ring because he wanted to inspect it in person before completing the purchase. The record does not support that assertion. Instead, the record shows that Evangelos wanted only to make sure that the ring he was purchasing was what Julie represented it to be. Before clicking the "Buy It Now" button, Evangelos asked Julie if she would be willing to meet face-to-face to complete the transaction. Julie agreed to do so; and only then did Evangelos click the "Buy It Now" button. Julie initially agreed to the sale and later agreed to wait for Evangelos to fly to Phoenix to complete the transaction. Even after Evangelos informed Julie that he was bringing a friend with more experience, Julie expressed her agreement to the sale going forward by confirming when and where the parties would meet to complete the transaction. Therefore, Julie's argument that Evangelos did not intend to purchase the ring is without merit.

¶20 Because a contract existed, Julie was required to abide by eBay's user agreement and complete the transaction. That agreement stated that sellers who offered items for over $10,000 could not request immediate payment. Instead, a buyer had three days to tender payment for any item that the buyer had the winning bid for or bought using the "Buy It Now" option. Julie, however, did not allow Evangelos the three days required to complete the transaction. Because Julie breached the contract, she was liable for Evangelos's damages and the trial court did not err by granting summary judgment.

### 2. Damages

¶21 Julie argues that the court erred by awarding Evangelos damages for three reasons: (1) Evangelos was not entitled to damages because no contract existed and nothing showed that Evangelos could have performed his contractual obligation; (2) Evangelos elected lost profit damages and provided no evidence to support those damages; and (3) even if Evangelos sought and was awarded damages for being denied the benefit of the bargain, the trial court ignored the method the UCC provided for

calculating those damages. Whether the trial court applied the correct measure of damages is a mixed question of fact and law we review de novo. *SDR Assocs. v. ARG Enters., Inc.*, 170 Ariz. 1, 2 (App. 1991). But "we defer to the trial court's superior position to weigh the evidence, make credibility determinations, and resolve conflicts in facts and expert opinions." *Great W. Bank v. LJC Dev., LLC*, 238 Ariz. 470, 482 ¶ 42 (App. 2015). Because Evangelos elected damages for being denied the benefit of the bargain under A.R.S. § 47–2713(A) and because sufficient evidence supports the trial court's damages finding, no error occurred.

¶22 As indicated above, Julie's first argument that damages were improper because no contract existed is incorrect. *See supra* section 1. Additionally, the record does not support Julie's second argument that Evangelos could not perform the contract had Julie not breached it. Evangelos testified that he was able and willing to purchase the ring and had even purchased tickets the same evening to fly to Phoenix. Further, Evangelos testified at trial that he could have purchased the ring through his $150,000 home equity line of credit. Thus, her first two arguments are without merit.

¶23 Julie next argues that Evangelos elected lost profits damages and not the loss of the benefit of the bargain under the UCC. This too is incorrect. The record supports the court's finding that Evangelos sought benefit of the bargain damages. The trial court noted that although the parties had used the phrase lost profits in the pretrial statement and in the summary judgment briefing, Evangelos's disclosures clearly described benefit of the bargain damages. Moreover, on the day of trial, Evangelos stated that he was electing to pursue benefit of the bargain damages and not lost profits.

¶24 Benefit of the bargain damages are measured by "the difference between the market price at the time when the buyer learned of the breach and the contract price[.]" A.R.S. § 47–2713(A). The test for determining market value is "what the property would sell for between a willing buyer and a willing seller in an arms-length transaction." *Honeywell Info. Sys., Inc. v. Maricopa Cty.*, 118 Ariz. 171, 174 (App. 1977). Here, sufficient evidence supports the trial court's finding that the ring's market value was $295,250. Evangelos's gemologist testified that he reviewed Rapnet to research other eight-carat diamond rings to find the ring's market value. The expert also testified that Rapnet had three eight-carat rings ranging in price from $372,000 to $402,000 and that he located Julie's ring on Rapnet with a $389,000 sale price. He further testified that diamond

prices listed on Rapnet are final and inclusive of all discounts. Therefore, the expert testified that the ring's market value was $389,000.

¶25        Julie's gemologist refused to give his expert opinion on the ring's market value. Instead, he simply stated that Rapnet was only a "shadow of the market" price and that he would determine the market value by looking at actual transactions and not asking prices. Discussing Rapnet further, Julie's expert stated that diamonds on Rapnet varied in sale price by upwards of 25%. The trial court heard this conflicting testimony and determined that reducing Evangelos's expert witness's market value determination by the 25% variation Julie's expert testified to would produce the ring's most accurate market value. On this record, we cannot say that the trial court erred by valuing the ring at $295,250 and thus awarding Evangelos $135,250 in damages. *See IB Prop. Holdings, LLC v. Rancho Del Mar Apartments Ltd. P'ship*, 228 Ariz. 61, 66 ¶ 13 (App. 2011) (citation omitted) ("We will not substitute our judgment for that of the trier of fact on matters pertaining to the credibility and weight of expert testimony.").

¶26        Julie counters that the correct way to determine market value was looking at the actual transactions. According to Julie, the ring's true market value would be between $150,000 and $166,765 — the price Julie sold the ring to the other eBay user for and the original price Daniel paid for the ring in 2005. The record, however, does not support this assertion. Both prices are drastically less than the prices of the three eight-carat rings Evangelos's expert found on Rapnet. Additionally, after purchasing the ring from Julie, the other eBay user listed it for sale at $389,000. Thereafter, the court found that Julie had grossly undervalued her ring at the time she initially offered the ring on eBay and did not know what the ring was worth when she subsequently sold it. As such, the record supports the court's finding that the listing prices on Rapnet better represented the ring's true market value than the ring's cost in 2005 or the price Julie sold it for when she apparently had made little, if any, inquiry into the ring's value and did not know the ring's actual worth.

### 3. Evangelos's Cross-Appeal

¶27        Evangelos cross-appeals, arguing that the trial court erred by dismissing Daniel from the case. Cross-appeals may be filed only against opposing party appellants, however. *See* Ariz. R. Civ. App. P. 9(b) ("[T]o cross-appeal a judgment a party must file a notice of cross-appeal under Rule 8 no later than 20 days after *appellant's* filing of a notice of appeal . . . .") (emphasis added); *see also Maxwell v. Aetna Life Ins. Co.*, 128 Ariz. 350, 352 (App. 1981). Evangelos timely cross-appealed following the court's denial

of Julie's motion for a new trial. Daniel was not listed as a party to Julie's request for a new trial nor was he listed in the notice of appeal. Instead, the notice of appeal specifically stated that "Defendant Julie Rohr" appealed the final judgment. Because Daniel had been dismissed as a party and was not listed on the notice of appeal, he is not considered an appellant in this case. Therefore, Evangelos's cross-appeal was not the proper way to appeal the trial court's ruling dismissing Daniel as a party. *See Maxwell*, 128 Ariz. at 352–53 (dismissing a cross-appeal against one defendant when the original notice of appeal explicitly excluded that defendant). Evangelos could have appealed from the court's dismissal of Daniel, but he failed to do so and the time to do so has long since passed. Thus, Evangelos's cross-appeal against Daniel is dismissed.

### 4. Attorneys' Fees on Appeal

¶28 Both parties request their attorneys' fees on appeal pursuant to A.R.S. § 12–341.01. Although we dismiss Evangelos's cross-appeal, he is the prevailing party on appeal. As such, we will award Evangelos his reasonable attorneys' fees related only to the appeal, and his taxable costs, upon his compliance with Arizona Rule of Civil Appellate Procedure 21.

### CONCLUSION

¶29 For the foregoing reasons, we affirm the trial court's ruling that the parties had a valid contract and that Julie breached it. We also affirm the trial court's method and calculation of damages incurred by Evangelos. Further, we dismiss Evangelos's cross-appeal.[3]



AMY M. WOOD • Clerk of the Court
FILED:　　JT

---

[3] Because we dismiss Evangelos's cross-appeal, we deny as moot "Appellant Cross-Appellee's Motion to Strike; Memorandum of Points and Authorities in Support."